[No. A120220. First Dist., Div. Two. Jan. 22, 2009.]

LEGAL SERVICES FOR PRISONERS WITH CHILDREN et al.,
Petitioners, v.
DEBRA BOWEN, as Secretary of State, etc., et al., Respondents.

448

COUNSEL

John R. Cosgrove for Petitioners.

Maya L. Harris, Margaret C. Crosby, Diana C. Tate, Saneta De Vuono-Powell; and Brad Seligman for the American Civil Liberties Union of Northern California and Impact Fund as Amici Curiae for Petitioners.

Edmund G. Brown, Jr., Attorney General, Christopher E. Krueger, Assistant Attorney General, Stephen P. Acquisto, Jason E. Rios and Jeffrey I. Beddell, Deputy Attorneys General, for Respondent Debra Bowen.

James N. Fincher, County Counsel, James E. Stone and Roger S. Matzkind, Chief Civil Litigators, for Respondent Registrar of Voters of Merced County.

Judy W. Whitehurst, County Counsel, and Patrice J. Salseda, Deputy County Counsel, for Respondent Registrar of Voters of Los Angeles County.

Robert A. Ryan, Jr., County Counsel, and John F. Whisenhunt, Jr., Assistant County Counsel, for Respondent Registrar of Voters of Sacramento County.

OPINION

RICHMAN, J.—Little-known section 2 of the Fourteenth Amendment of the United States Constitution allows states, without offending equal protection, to disenfranchise citizens "for participation in rebellion or other crime." Petitioners here seek a writ of mandate, claiming that the disenfranchisement allowed by the section is limited to felonies at common law. We conclude that there is no historical evidence supporting the claim. And the United States Supreme Court in interpreting the Constitution has never read the word "crime" as petitioners contend. We thus deny the writ.

## BACKGROUND

There are seven petitioners in all (collectively, Petitioners), the first two of which are entities: Legal Services for Prisoners with Children and The Center for Children of Incarcerated Parents.[1] The former is a nonprofit organization that promotes "the interests of parents who are incarcerated, on parole, or at risk of incarceration, and their children"; the latter is a private nonprofit corporation that "provides services, conducts research, and produces publications about and for children of criminal offenders and their families."

The other five Petitioners are individuals, three of whom are on parole for what they assert are crimes that were not felonies at common law, though without specifying the exact crimes of which they were convicted: Ann Marie Taylor and Veronica Briscoe assert that they were convicted of, and are on parole for, violations of the Health and Safety Code; Audra Kettlewell asserts she was on parole at the time the petition was filed, but that her parole was scheduled to expire in February 2008. The other two petitioners, Arlene Robinson and Pat Caetano, assert that they are currently on parole for convictions of felonies at common law.

There are five respondents, all of whom oversee voting in their official capacity (collectively, Respondents). The first is Debra Bowen, the California Secretary of State. The others are the registrars of voters of four counties: Steven Weir (Contra Costa County), Conny McCormack (Los Angeles County), Stephen Jones (Merced County), and Jill Lavine (Sacramento County).

Petitioners originally filed their petition for writ of mandate[2] in our Supreme Court, which transferred the matter to this court. We requested informal responses from Respondents and a reply from Petitioners; we also

---

[1] Petitioners seek class status for two classes of Petitioners: first, all otherwise eligible voters who are disenfranchised because of conviction for a crime other than a felony at common law and, second, otherwise eligible voters who are disenfranchised because they are on parole. They also seek certification as a class of respondents all registrars of voters who are not named parties in this action. As we deny the petition, the class certification requests are denied as moot. We also deny as moot Petitioners' request for judicial notice of various statistics regarding the population of African-Americans in prison and on parole in California and in the general population in California.

[2] These claims are appropriately raised by mandate, as Petitioners seek to compel voting registrars to perform their "ministerial duty of permitting qualified voters to register. Mandamus is clearly the proper remedy for compelling an officer to conduct an election according to law." (*Jolicoeur v. Mihaly* (1971) 5 Cal.3d 565, 570, fn. 2 [96 Cal.Rptr. 697, 488 P.2d 1]; see also *League of Women Voters of California v. McPherson* (2006) 145 Cal.App.4th 1469, 1473 [52 Cal.Rptr.3d 585] (*McPherson*) [challenge to disenfranchisement of felons on probation properly raised by mandate in appellate court].)

received briefing from the American Civil Liberties Union of Northern California and Impact Fund as amici curiae. We issued an order to show cause and heard oral argument. We now deny the petition.

## DISCUSSION

### A. *The General Principles*

■ "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." (*Wesberry v. Sanders* (1964) 376 U.S. 1, 17–18 [11 L.Ed.2d 481, 84 S.Ct. 526].) To ensure that our citizens enjoy this precious right, the United States Constitution sets forth fundamental principles governing the franchise: equal suffrage based on race (15th Amend.); equal suffrage based on sex (19th Amend.); poll tax prohibition (24th Amend.); and enfranchising citizens over 18 years of age (26th Amend.).

■ States nonetheless "have broad powers to determine the conditions under which the right of suffrage may be exercised, . . . absent of course the discrimination which the Constitution condemns." (*Lassiter v. Northampton Election Bd.* (1959) 360 U.S. 45, 50 [3 L.Ed.2d 1072, 79 S.Ct. 985], citations omitted.) Relevant to the issue here, California prohibits felons in prison or on parole from voting. Although the laws have changed over the years,[3] the current language in the California Constitution requires the Legislature to "provide for the disqualification of electors while mentally incompetent or imprisoned or on parole for the conviction of a felony." (Cal. Const., art. II, § 4.) Elections Code section 2101 implements that requirement, and provides that "[a] person entitled to register to vote shall be a United States citizen, a resident of California, not in prison or on parole for the conviction of a felony, and at least 18 years of age at the time of the next election."

■ Challenges to state laws restricting the right to vote have typically been brought under the equal protection clause found in section 1 of the Fourteenth Amendment. A law disenfranchising voters violates equal protection if there is "purposeful discrimination" and "a discriminatory effect" on

---

[3] The history of the changes to voting rights in California has been discussed at length in other cases, and we need not repeat it here. (See *Ramirez v. Brown* (1973) 9 Cal.3d 199, 204–205 [107 Cal.Rptr. 137, 507 P.2d 1345]; *McPherson, supra,* 145 Cal.App.4th at pp. 1475–1479.)

the defendant specifically as a result of that "purposeful discrimination." (*McCleskey v. Kemp* (1987) 481 U.S. 279, 292 [95 L.Ed.2d 262, 107 S.Ct. 1756].) "In determining whether or not a state law violates the Equal Protection Clause, [courts] must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." (*Williams v. Rhodes* (1968) 393 U.S. 23, 30 [21 L.Ed.2d 24, 89 S.Ct. 5].) If the facts and circumstances show that racial discrimination was "a 'substantial' or 'motivating' factor behind the enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." (*Hunter v. Underwood* (1985) 471 U.S. 222, 228 [85 L.Ed.2d 222, 105 S.Ct. 1916].) Or, as the United State Supreme Court explained in the context of a residency requirement, "It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision,' *NAACP* v. *Button* [(1963) 371 U.S. 415 [9 L.Ed.2d 405, 83 S.Ct. 328]] . . . ; *United States* v. *Robel* [(1967) 389 U.S. 258, 265 [19 L.Ed.2d 508, 88 S.Ct. 419]] . . . , and must be 'tailored' to serve their legitimate objectives. (*Shapiro* v. *Thompson* [(1969) 394 U.S. 618,] 631 [22 L.Ed.2d 600, 89 S.Ct. 1322].) And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' " (*Dunn v. Blumstein* (1972) 405 U.S. 330, 343 [31 L.Ed.2d 274, 92 S.Ct. 995].)

B. *The Background: Section 2 of the Fourteenth Amendment,* Richardson v. Ramirez, Hunter v. Underwood, *and the Reconstruction Act*

■ Section 2 of the Fourteenth Amendment exempts from equal protection disenfranchisement for "participation in . . . crime." As noted, Petitioners raise a single claim: that the exemption in the section is limited to felonies at common law. Analysis of Petitioners' argument requires that we take an unusual journey—to determine the intent of the post-Civil War Congress in drafting section 2.

Section 2 provides in its entirety as follows: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in

Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

As our colleagues in Division One have distilled it, section 2 "imposes a penalty on states that deny the vote to male citizens 21 years or older, except for those who participated in rebellion or [other] crime, by reducing that state's congressional delegation." (*McPherson, supra*, 145 Cal.App.4th at p. 1478, fn. 6.)

*Richardson v. Ramirez* (1974) 418 U.S. 24 [41 L.Ed.2d 551, 94 S.Ct. 2655] (*Richardson*) is the only case decided by the United States Supreme Court that offers an in-depth analysis of section 2 of the Fourteenth Amendment. There, the court reviewed the decision by the California Supreme Court that had concluded that equal protection prohibited disenfranchising "ex-felons," that is, felons who had already completed their sentence and parole.[4] (418 U.S. at pp. 26, 31.) Specifically, *Richardson* addressed whether the predecessor to article II, section 4 of the California Constitution—which disenfranchised anyone convicted of "an infamous crime"—violated equal protection. And held that it did not.

The petitioner in *Richardson*, the Mendocino County Clerk, argued that the disenfranchisement of "ex-felons" was exempted from equal protection under section 2 of the Fourteenth Amendment. (*Richardson, supra*, 418 U.S. at p. 37.) She reasoned that "those who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in § 1 of that Amendment that which was expressly exempted from the lesser sanction of reduced representation imposed by § 2 of the Amendment." (*Id.* at p. 43.) The Supreme Court found this "a persuasive [argument] unless it can be shown that the language of § 2, 'except for participation in rebellion, or other crime,' was intended to have a different meaning than would appear from its face." (*Ibid.*) To answer that question, the court reviewed the "scant" history of

---

[4] The constitutional provision in effect at the time allowed the disenfranchisement of anyone convicted of a felony, regardless of whether they were in prison or had completed parole. After the California Supreme Court opinion, the voters amended the California Constitution in this regard to conform with the dictates of that opinion. (See *McPherson, supra*, 145 Cal.App.4th at pp. 1478–1479.) The relevant constitutional and statutory provisions have not been changed since. (*Ibid.*)

section 2 to determine whether "this language was intended by Congress to means what it says." (418 U.S. at p. 43.) That history showed that "the framers of the Amendment were primarily concerned with the effect of reduced representation upon the States, rather than with the two forms of disenfranchisement which were exempted from that consequence by the language" at issue in *Richardson*. (*Ibid.*) Indeed, the history gave no indication that section 2 had any meaning other than that which appeared from its plain language. (418 U.S. at pp. 44–48.) This purpose led the court to conclude that under section 2, disenfranchisement of felons is exempted from the equal protection clause in section 1 of the Fourteenth Amendment. (418 U.S. at pp. 54–55.)

The *Richardson* holding was recently discussed in *McPherson*, where the Court of Appeal concluded that felony *probationers* could not be disenfranchised under Elections Code section 2106, which "provides that persons '*in prison* or on parole for the conviction of a felony' are not entitled to register to vote." (*Richardson, supra*, 145 Cal.App.4th at p. 1484.) The court explained: "It is perhaps significant that the United States Supreme Court did *not* conclude that disenfranchising all persons convicted of infamous crimes was consistent with equal protection guarantees set forth in section 1 of the Fourteenth Amendment to the United States Constitution. It instead construed section 2 of the Fourteenth Amendment to except the disenfranchisement of felons from the protections afforded by section 1. . . . In brief, section 2 imposes a penalty on states that deny the vote to male citizens 21 years or older, except for those who participated in rebellion or crime, by reducing that state's congressional delegation. The Supreme Court construed the phrase so that it not only removed a class of persons from being counted in determining whether a state was subject to the penalty of subdivision 2, but also removed the same class from the protections afforded by section 1." (*McPherson, supra*, 145 Cal.App.4th at p. 1478, fn. 6.)

The United States Supreme Court has addressed section 2's disenfranchisement of felons in one other case—*Hunter v. Underwood, supra*, 471 U.S. 222, where the court reviewed a challenge to article VIII, former section 182 of the Alabama Constitution, which disenfranchised persons convicted of "any crime . . . involving moral turpitude." The court found that the legislative history proved that the purpose of section 182 was to disenfranchise African-American voters (471 U.S. at pp. 226–228), and easily determined that the section 2 exemption did not apply: "we are confident that § 2 was not designed to permit the purposeful racial discrimination attending the enactment of and operation of § 182 which otherwise violates § 1 of the

Fourteenth Amendment. Nothing in our opinion in *Richardson v. Ramirez, supra,* [418 U.S. 24] suggests the contrary." (471 U.S. at p. 233.) The Supreme Court thus held the exemption did not apply because the motivation for the criminal disenfranchisement was racial discrimination.

Congressional motivation in drafting section 2 of the Fourteenth Amendment is also instructive. While there is, in the words of *Richardson,* only "scant" legislative history of section 2, what there is shows that the post-Civil War Congress faced a perplexing dilemma: readmittance of the former rebel states into the Union and adoption of the Thirteenth Amendment, which abolished slavery, would seem to result in a Democratic majority in Congress. Facing the Republican-controlled "Congress when it convened in 1865 after the Civil War, was the urgent problem of insuring that the new representational power resulting from the thirteenth amendment's abolition of slavery did not redound to the old southern leadership." (Bonfield, *The Right to Vote and Judicial Enforcement of Section Two of the Fourteenth Amendment* (1960) 46 Cornell L.Q. 108, 109, fn. omitted.)

Given this conundrum, the Republican majority fashioned section 2 of the Fourteenth Amendment to ensure that victory in the Civil War did not result in a Democratic majority in Congress. Earlier drafts of section 2 sought to achieve this by enfranchising African-Americans, but that proved to be politically prohibitive. The solution was to put states themselves in a conundrum, by forcing them either to allow all male citizens over 21 years of age to vote or have the Congressional delegation from that state reduced proportionally. This result proved politically viable, resulting in the current version of section 2.[5] As the Congressional Research Service of the Library of Congress has observed: "With the abolition of slavery by the Thirteenth

---

[5] We are not the first to confirm this motivation. Justice Marshall in his dissent in *Richardson* noted that "[t]he Republicans who controlled the 39th Congress were concerned that the additional congressional representation of the Southern States which would result from the abolition of slavery might weaken their own political dominance. There were two alternatives available—either to limit southern representation, which was unacceptable on a long-term basis, or to insure that southern Negroes, sympathetic to the Republican cause, would be enfranchised; but an explicit grant of suffrage to Negroes was thought politically unpalatable at the time. Section 2 of the Fourteenth Amendment was the resultant compromise. It put the Southern States to a choice—enfranchise Negro voters or lose congressional representation." (*Richardson, supra,* 418 U.S. at pp. 73–74 (dis. opn. of Marshall, J.), fns. omitted.)

The dissent in *Hayden v. Pataki* (2d Cir. 2006) 449 F.3d 305, recently echoed that observation: "[t]he concern of the Republican legislators who drafted § 2 of the Fourteenth Amendment was that, with the slaves emancipated, the Three-Fifths Compromise would be inoperative, freedmen would therefore be counted fully in decennial censuses, and the former slave states would soon be entitled to enough additional representatives to threaten Republican control of the federal government." (*Id.,* at p. 351 (dis. opn. of Parker, J.), citing *Richardson, supra,* 418 U.S. at pp. 73–74 (dis. opn. of Marshall, J.).)

Amendment, the African-Americans formerly counted as three-fifths of persons would be fully counted in the apportionment of seats in the House of Representatives, increasing as well the electoral vote, there appeared the prospect that politically the readmitted Southern States would gain the advantage in Congress when combined with Democrats from the North. Inasmuch as the South was adamantly opposed to African-American suffrage, all the congressmen would be elected by whites. Many wished to provide for the enfranchisement of the African-American and proposals to this effect were voted on in both the House and the Senate, but only a few Northern States permitted African-Americans to vote and a series of referenda on the question in Northern States revealed substantial white hostility to the proposal. Therefore, a compromise was worked out, to effect a reduction in the representation of any State which discriminated against males in the franchise." (Cong. Research Service, Library of Cong., The Constitution of the United States of America, Analysis and Interpretation (2004) pp. 2033–2034.)

In short, the motivation behind section 2 was to create an enduring framework for apportionment of representatives that also inured to the advantage of the victors of the Civil War.

The Reconstruction Act of March 2, 1867 (Act of Mar. 2, 1867, ch. 153, § 5, 14 Stat. 428; Reconstruction Act), on the other hand, was not enduring. It was temporal legislation designed to foster the rebuilding of the Union after the Civil War by "establish[ing] conditions on which the former Confederate States would be readmitted to representation in Congress." (*Richardson, supra,* 418 U.S. at p. 49.) Part of that process was to ensure that the former rebel states reconstituted their governments within the framework provided by the United States Constitution. In relevant part, the Reconstruction Act provides that a congressional delegation from a former rebel state would be admitted to Congress if the state adopts a state "constitution of government in conformity with the Constitution of the United States in all respects, framed by a convention of delegates elected by the male citizens of said State, twenty-one years old and upward, of whatever race, color, or previous condition, who have been resident in said State for one year previous to the day of such election, *except such as may be disfranchised for participation in the rebellion or for felony at common law.*" (*Richardson,* at p. 49, quoting the Reconstruction Act.)

C. *Disenfranchisement allowed under section 2 of the Fourteenth Amendment is not limited to common law felonies*

Petitioners contend that the disenfranchisement for "crime" allowed by section 2 of the Fourteenth Amendment is limited to felonies at common law.

This interpretation, Petitioners assert, advances the framers' intent and is consistent with the definition of "crime" at the time the amendment was adopted and with contemporaneous legislation, primarily the Reconstruction Act. Petitioners further argue that if section 2 is not interpreted to restrict permitted disenfranchisement to felonies at common law, it would lead to an absurd result. Respondents counter that this issue was already decided in *Richardson*. They also argue that, even if it were not, Petitioners' reading of section 2 is contrary to its plain language and does not advance its intent.

At first blush, *Richardson* does appear to foreclose Petitioners' argument, as the holding is that California may disenfranchise "convicted felons." (*Richardson, supra*, 418 U.S. at p. 56.) Supporting this conclusion is the fact that one of the respondents in *Richardson* was convicted of drug possession, a crime that was not a felony at common law. (*Id.* at p. 32, fn. 9.) Moreover, in earlier cases the Supreme Court upheld disenfranchisement for conviction of non-common-law felonies, shown by *Murphy v. Ramsey* (1885) 114 U.S. 15 [29 L.Ed. 47, 5 S.Ct. 747] and *Davis v. Beason* (1890) 133 U.S. 333 [33 L.Ed. 637, 10 S.Ct. 299], the late 19th century cases allowing Utah and Idaho, respectively, to disenfranchise bigamists and polygamists. Respondents argue that since the Supreme Court has repeatedly allowed disenfranchisement for conviction of crimes that were not felonies at common law, section 2 should not be limited in a manner inconsistent with its plain words.

But however forceful and logical this argument, *Richardson*, *Murphy*, or *Davis* cannot be read to foreclose this issue. None of these cases expressly considers whether the section 2 exemption is limited to felonies at common law, and "[c]onstitutional rights are not defined by inferences from opinions which did not address the question at issue." (*Texas v. Cobb* (2001) 532 U.S. 162, 169 [149 L.Ed.2d 321, 121 S.Ct. 1335]; see also *U.S. v. Harrison* (10th Cir. 2002) 296 F.3d 994, 1005 ["a prior opinion cannot stand as precedent for a proposition of law not explored in the opinion, even when the facts stated in the opinion would support consideration of the proposition."].) In sum, we cannot confidently conclude that the Supreme Court has held that the section 2 exemption for conviction of a "crime" is not limited to felonies at common law.

That said, the Supreme Court language is compelling. In describing the section 2 exemption, the majority opinion in *Richardson* used the words "felony," "felon," or "ex-felon" at least two dozen times. By contrast, not once did the opinion describe the exemption to apply to "felonies at common law."[6] Tellingly, *Richardson* was applied to a respondent who was convicted of drug possession, a crime that was not a felony at common law. Perhaps even more

---

[6] In fact, the only time the phrase "felonies at common law" appears in the opinion is when the court is quoting the Reconstruction Act.

significantly, the Supreme Court cited two cases that upheld the disenfranchisement of felons convicted of non-common-law felonies. It is difficult to believe the Supreme Court would have so held if section 2 were as restricted as Petitioners assert.

■ But beyond this, all indications are that "other crime" as used in section 2 of the Fourteenth Amendment is not limited to felonies at common law. Such indications are found in the Supreme Court's interpretation of the word "crime" elsewhere in the Constitution. And also in the definitions of that word at the time of the adoption of the Fourteenth Amendment.

■ "The normal rule of statutory construction assumes that ' "identical words used in different parts of the same act are intended to have the same meaning." ' " (*Sorenson v. Secretary of Treasury* (1986) 475 U.S. 851, 860 [89 L.Ed.2d 855, 106 S.Ct. 1600].) Likewise, when a word is used repeatedly in the Constitution, it is given the same meaning throughout unless the context clearly requires otherwise. This is illustrated, for example, by *National Ins. Co. v. Tidewater Co.* (1949) 337 U.S. 582 [93 L.Ed. 1556, 69 S.Ct. 1173], where the Supreme Court was interpreting whether Washington D.C. was a "state" for the purposes of diversity jurisdiction under article III of the federal Constitution. Concluding that the founders did not mean for the word "state" to apply to the District of Columbia, the court looked to other instances where it interpreted whether the District was a "state," noting that where "the word is one which can contain many meanings, such inconsistency in a single instrument is to be implied only where the context clearly requires it." (*National Ins. Co.*, at p. 587.)[7]

Interpretation of "crime" by the United States Supreme Court in other constitutional provisions has found the word to mean, if not limited by context, a "serious" offense, not a "petty" one. Thus, the Sixth Amendment guarantees that in "all criminal prosecutions" the defendant has the right to a jury trial held in the state or district in which the "crime" was committed. This right has been repeatedly held to apply to "serious crimes," offenses that carry a minimum sentence of six months or more. (*Baldwin v. New York* (1970) 399 U.S. 66, 68–69 [26 L.Ed.2d 437, 90 S.Ct. 1886].) A similar analysis has been applied to article III, section 2, clause 3 of the federal Constitution, which provides that "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ." Used in that context, "crimes" has also

---

[7] Our Supreme Court interprets the California Constitution in a similar manner. For example, in determining the meaning of "fee" and "charge" in certain constitutional provisions, the court looked to how those words were used elsewhere in the Constitution. Doing so, the court noted that "when a word has been used in different parts of a single enactment, courts normally infer that the word was intended to have the same meaning throughout." (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 213 [46 Cal.Rptr.3d 73, 138 P.3d 220].)

been held to apply only to "serious crimes." (*Dist. of Columbia v. Clawans* (1937) 300 U.S. 617, 621–622 [81 L.Ed. 843, 57 S.Ct. 660].)

In other situations, the context of the provision limits or expands the meaning of "crime." For instance, the extradition provision in article IV, section 2 allows a state to extradite any person charged with "treason, felony, or other crime." Read in context with the words treason and felony, the court concluded that other crime "includes every offence, from the highest to the lowest in the grade of offences, and includes what are called 'misdemeanors,' as well as treason and felony." (*Commonwealth of Ky. v. Dennison, Governor, &c.* (1861) 65 U.S. 66, 99 [16 L.Ed. 717], overruled on other grounds in *Puerto Rico v. Branstad* (1984) 483 U.S. 219 [97 L.Ed.2d 187, 107 S.Ct. 2802].)

In short, nowhere in the Constitution has the word "crime" been limited to felonies at common law. Rather, "crime" has been read to mean a "serious" offense or, where context requires, all criminal offenses. Nonetheless, Petitioners argue that "rebellion" modifies "crime," resulting in an idiomatic meaning, i.e., only felonies at common law. This reading, as demonstrated above, is not supported by the plain language of section 2 of the Fourteenth Amendment. Nor by the contemporaneous definitions of crime.

The 1854 edition of a leading dictionary defined "crime" as "[a]n act which violates a law, divine or human." (Webster's, American Dict. of English Language (1854) p. 283.) Thirteen years later, the 1867 edition of that dictionary defined "crime" as a "[g]ross offense, or violation of law, in distinction from a misdemeanor or trespass, or other slight offense." (Webster's American Dict. of English Language (1867) p. 313.) This edition further explains that the word "crime" means "a violation of law either human or divine; but in present usage the term is commonly applied to actions contrary to the laws of the state." (*Ibid.*) "[A]ctions contrary to the laws of the state" by definition include statutory crimes. These definitions are devastating to Petitioners' argument. So, too, the legal dictionaries.

The 1866 edition of a leading legal dictionary—an edition, not incidentally, published contemporaneous with the adoption of Fourteenth Amendment— defines "crime" as "an offense against public law." It continues: "[t]his word, in its most general signification, comprehends all offenses; but, in its limited sense, it is confined to felony." (Bouvier's Law Dictionary (1866) p. 352.) Nowhere in this primary definition is "crime" limited to felonies at common law. And the fourth definition could not be more on point: "Crimes are defined and punished by statutes and by the common law." (*Ibid.*; accord, 1897 version ["Crimes are defined and punished by statutes and by the common law."].) In sum, all authorities demonstrate that at the time the

Fourteenth Amendment was drafted the definition of "crime" was not limited to felonies at common law. Rather, "crime" meant a serious offense, including statutory felonies.

What case authority there is confirms our conclusion, shown by the holdings of the federal cases directly addressing whether the section 2 exemption is restricted to felonies at common law. Two recent United States District Court cases granting Federal Rules of Civil Procedure (28 U.S.C.) rule 12(b)(6) motions to dismiss have rejected the claim Petitioners assert here: *Coronado v. Napolitano* (D.Ariz., Nov. 6, 2008, No. CV 07-1089-PHX-SMM) 2008 WL 4838707 and *Harvey v. Napolitano* (D.Ariz., Sept. 18, 2008, No. CV 08-17-TUC-FRZ(HCE)) 2008 WL 4277951. The district court in *Harvey*, quoting from an earlier ruling in *Coronado*, noted that use of "crime" in section 2 of the Fourteenth Amendment and "felonies at common law" in the Reconstruction Act did not support the plaintiff's argument: " 'First, it demonstrates that where Congress intended to specify common law felonies, it so stated. Second, the acts cited by Plaintiffs dealt with readmission of former Confederate states, whereas the Fourteenth Amendment applies to all states in the Union. Thus the varying language need not be "harmonized" as Plaintiffs contend because the different provisions address different subjects . . . .' " (*Harvey v. Napolitano, supra,* 2008 WL 4277951 at p. *6.)

*Perry v. Beamer* (1996) 933 F.Supp. 556 is similar. There, the plaintiff challenged Virginia's disenfranchisement of all persons "convicted of a felony." Noting that one of the respondents in *Richardson* was convicted of a crime "not recognized by the common law in the 19th century as a felony," the court observed that "[t]he Supreme Court, however, apparently gave no import to this distinction, and this Court shall do the same." (*Id.* at p. 559.)[8]

Notwithstanding all this, Petitioners assert that failing to give "crime" as used in this context a different, idiomatic meaning would lead to an absurd

---

[8] Language in one California case is also supportive, though not in the context at issue here. That language is in *Flood v. Riggs* (1978) 80 Cal.App.3d 138 [145 Cal.Rptr. 573], a mandate petition by a paroled felon seeking to have the county registrar of voters register him. Division One of this court rejected the petition, holding as follows: "We hold, therefore, that the provisions of article II, section 4, of the California Constitution for the disqualification of electors while imprisoned or on parole for the conviction of a felony are self-executing; that pursuant to such self-executing provisions, *an elector convicted of any felony is temporarily disfranchised while serving a sentence of imprisonment or while undergoing an unexpired term of parole.*" (80 Cal.App.3d at p. 155, italics added.) The court then went on to address an argument based on section 2, but not the argument Petitioners make here.

result, and it would allow the rebel states to artificially decrease the African-American electorate through manipulation of the criminal justice system.[9] According to Petitioners, the rebel states would easily disenfranchise large numbers of African-Americans through conviction of trumped-up charges: "Blacks would inevitably receive harsher treatment from white police, prosecutors, judges, and juries. The only way to limit abuse of the exception for crime was to limit criminal disenfranchisement to a fixed category of offenses." To support this theory, Petitioners point to the language in the Reconstruction Act that the electorate for the state constitutional conventions is " 'the male citizens of said State, twenty-one years old and upward, of whatever race, color, or previous condition, who have been resident in said State for one year previous to the day of such election, *except such as may be disfranchised for participation in the rebellion or for felony at common law.*' " (*Richardson, supra,* 418 U.S. at p. 49.) This shows, according to Petitioners, that Congress understood the problem and sought to resolve it by limiting the crimes that could be used to disenfranchise African-Americans.

We disagree, and do so with two observations. The first is that the fear of the trumping-up of charges by the rebel states could well have been *the* reason that the Reconstruction Act read as it did, so that the disenfranchisement in that setting was limited to "felonies at common law." The second observation is that confirmed by the district court judges in *Coronado* and *Harvey*: the different language in section 2 and in the Reconstruction Act shows that Congress knew how to say what it meant.

As demonstrated above, the plain meaning of section 2 of the Fourteenth Amendment is clear and unambiguous. Petitioners show nothing to the contrary, no legislative history showing that crime should be read in the restrictive manner they assert, nothing showing that the 39th Congress ever considered "crime" to be limited to felonies at common law. Our review of the legislative history reveals the same—nothing.

Petitioners argue, citing nothing, that the *only* logical conclusion is that when the 39th Congress said "crime," it must have meant felonies at common law. Attempting to explain the lack of Congressional debate or discussion regarding the meaning of "other crime," Petitioners assert that "[t]he only plausible explanation for the lack of interest in the exception is that the members of Congress were in agreement that the exception was limited to

---

[9] Petitioners also argue that if section 2 and the Reconstruction Act are not harmonized, the Reconstruction Act would be contrary to the Constitution, as the latter would impose stricter standards for disenfranchisement than section 2. We easily reject this argument, as section 2 does not apply to the Reconstruction Act. Section 2 applies to certain state elections—executive, legislative, and judicial. The voting provided for in the Reconstruction Act does not fall within any of those three categories. Rather, it set forth the manner of electing delegates to the state constitutional conventions.

common law felonies and that large scale penalty free disenfranchisement would be greatly impeded by this requirement." This argument is without any historical or legal support, and we decline to rewrite section 2 of the Fourteenth Amendment based on rank speculation.

We cannot conclude this discussion without comment on the difficulties present were we to accept Petitioners' argument, not to mention the perverse effect such acceptance would have. Specifically:

Petitioners' fundamental position is that there were 10 felonies at common law: treason, murder, manslaughter, mayhem, rape, arson, burglary, robbery, larceny, and sodomy. (See *Jerome v. United States* (1943) 318 U.S. 101, 108, fn. 6 [87 L.Ed. 640, 63 S.Ct. 483].) In claimed support of such list, Petitioners assert, without benefit of authority, that the "common law" is limited to the "body of law developed in England from judicial decisions based on custom and precedent, unwritten in statute and code." The issue is hardly so simple.

To begin with, while Petitioners' initial brief listed the 10 crimes as felonies at common law, their reply notes that 1 Wharton's Criminal Law (13th ed. 1989) section 26, "unhesitantly" acknowledges seven common law felonies: murder, manslaughter, arson, rape, sodomy, mayhem, and larceny. A footnote then acknowledges that "prison break" is omitted from some lists of common law felonies.

Further complicating the matter is Blackstone, relied on heavily by Petitioners at oral argument. Blackstone does not present a specific list of common law felonies, but offers the definition of crimes "which occasioned at common law the forfeiture of lands or goods." (2 Blackstone, Commentaries (1871) p. 353.) Included in this discussion are treason, suicide, homicide, and "petit larceny or pilfering." (*Ibid.*) An 1816 legal dictionary lists felonies at common law by their class: crimes "against the life of a man, as murder, manslaughter . . . . Against a man's goods, such as larceny and robbery: Against his habitation, as burglary, arson, or house-burning, and against public justice, as breach of prison." (Williams, Law Dict. (1816).) And one dictionary from the late 19th century lists eight specific crimes: murder, manslaughter, rape, arson, burglary, theft, and robbery. (Anderson, Dict. of Law (1893) p. 454.) So, what is Petitioners' number of felonies at common law? Ten? Seven? Eight? Or is it "10 or so," the number used at oral argument.

■ The Attorney General asserts that felonies at common law included numerous other crimes, some statutory in nature. And what California law there is on the subject supports that position. For example, *People v.*

*Rehman* (1967) 253 Cal.App.2d 119, 150 [61 Cal.Rptr. 65], observed that "[t]he common law is all the statutory and case law background of England and the American colonies before the American Revolution." And in *People v. Martin* (1922) 188 Cal. 281, 286 [205 P. 121], the Supreme Court indicated that the common law includes both the principles, usages, and rules of action which do not rest on written law *and* the written and statutory laws.

These observations are consistent with the views of a leading hornbook: "In early England, usage and custom were the generally accepted methods of determining the kinds of conduct which warranted punishment. In the course of implementing such standards, the courts refined and molded them to accommodate varying fact situations. Moreover, statutes were passed from time to time supplementing or modifying this decisional law. After centuries of this kind of case-law development and supportive statutes . . . a vast body of generally accepted law came to emerge. *This body of law came to be called the English common law.* When the English colonists came to America, they brought with them so much of the common law as was appropriate to their new surroundings and conditions. This included any English statutes, enacted prior to the Revolution, which had been generally accepted by the Colonies." (1 Wharton's Criminal Law (15th ed. 1993) Definition and Classification, § 9, pp. 29–32, italics added.)

The issue is further complicated because of the numerous and specific crimes populating California's Penal Code. For instance, most (but not all) lists of felonies at common law include rape. Would sex crimes similar to, but not identical to, rape be included? Child molestation? Forcible oral copulation? Penetration by a foreign object? Theft crimes offer similar problems. Blackstone's definition includes "petit larceny or pilfering." Would this mean a misdemeanor petty theft was a felony at common law?

These questions are only the half of it.

If Petitioners' argument were accepted, it would mean that someone convicted of larceny, a felony at common law, would not be allowed to vote, however modest the take. But the defendants in *People v. Schoenfeld* (1980) 111 Cal.App.3d 671 [168 Cal.Rptr. 762], serving life sentences for kidnapping 27 children and burying them in a school bus for 28 hours, would. As would the serial child molester. And the drug kingpin. If that manifests a worthy public policy, it comes in a novel guise.

## DISPOSITION

The petition for writ of mandate is denied.

Kline, P. J., and Lambden, J., concurred.

Petitioners' petition for review by the Supreme Court was denied April 15, 2009, S170852.