**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEBRA L. HARVEY and CATHERINE
M. BEDDARD,
       *Plaintiffs-Appellants,*

v.

JANICE K. BREWER, Governor; KEN
BENNETT, Secretary of State of
Arizona; and F. ANN RODRIGUEZ,
Pima County Recorder, in their
official capacities,
       *Defendants-Appellees.*

No. 08-17253

D.C. No.
CV-08-17-TUC-
FRZ

ARMANDO CORONADO; JOSEPH
RUBIO; MICHAEL GARZA; MICHELE
CONVIE; and RAYMOND LEWIS,
       *Plaintiffs-Appellants,*

v.

JANICE K. BREWER, Governor; KEN
BENNETT, Secretary of State of
Arizona; F. ANN RODRIGUEZ, Pima
County Recorder; and HELEN
PURCELL, Maricopa County
Recorder, in their official
capacities,
       *Defendants-Appellees.*

No. 08-17567

D.C. No.
CV-07-1089-PHX-
SMM

OPINION

Appeals from the United States District Court
for the District of Arizona
Frank R. Zapata, District Judge, Presiding (No. 08-17253)
Stephen M. McNamee, District Judge, Presiding
(No. 08-17567)

7655

Argued and Submitted
October 19, 2009—Tempe, Arizona

Filed May 27, 2010

Before: Sandra Day O'Connor, Associate Justice,*
Alex Kozinski, Chief Judge, and Sandra S. Ikuta,
Circuit Judge.

Opinion by Associate Justice O'Connor

---

*The Honorable Sandra Day O'Connor, Associate Justice of the United
States Supreme Court (Ret.), sitting by designation pursuant to 28 U.S.C.
§ 294(a).

## COUNSEL

John R. Cosgrove, Menlo Park, California, for plaintiffs-appellants Debra L. Harvey and Catherine M. Beddard.

Daniel Pochoda, American Civil Liberties Union of Arizona, Phoenix, Arizona, for plaintiffs-appellants Armando Coronado, Joseph Rubio, Michael Garza, Michele Convie, and Raymond Lewis.

Laughlin McDonald, Neil Bradley, and Nancy G. Abudu, American Civil Liberties Union Voting Rights Project, Atlanta, Georgia, for plaintiffs-appellants Armando Coronado, Joseph Rubio, Michael Garza, Michele Convie, and Raymond Lewis.

Terry Goddard, Attorney General, Mary O'Grady, Solicitor General, and Barbara A. Bailey, Assistant Attorney General, Phoenix, Arizona, for defendants-appellees Janice Brewer and Ken Bennett.

Barbara LaWall, Pima County Attorney, Tucson, Arizona, for defendant-appellee F. Ann Rodriguez.

Erika Wood and Myrna Pérez, Brennan Center for Justice, New York, New York, on behalf of amicus curiae the Brennan Center for Justice.

Lawrence S. Lustberg, Jennifer B. Condon, Gibbons, P.C., Newark, New Jersey, on behalf of amicus curiae the Brennan Center for Justice.

---

## OPINION

O'CONNOR, Associate Justice (Ret.):

Arizona's Constitution provides: "No person who is adjudicated an incapacitated person shall be qualified to vote at any election, nor shall any person convicted of treason or felony, be qualified to vote at any election unless restored to civil rights." Ariz. Const. art. VII, § 2. Arizona statutes give effect to this constitutional provision by suspending the voting rights of any person convicted of a felony, Ariz. Rev. Stat. § 13-904(A)(1), and automatically restoring those rights to any person convicted of only one felony, provided he: "1. Completes a term of probation or receives an absolute discharge from imprisonment," and "2. Pays any fine or restitution imposed." Ariz. Rev. Stat. § 13-912(A).

Plaintiffs brought suits challenging Arizona's disenfranchisement scheme. Their first argument was that disenfranchisement for felonies not recognized as such at common law

violates the Equal Protection Clause of the Fourteenth Amendment. While plaintiffs acknowledged that Section 2 of the Fourteenth Amendment insulates felon-disenfranchisement schemes from equal protection challenges to some extent, *see Richardson v. Ramirez*, 418 U.S. 24 (1974), they argued that Section 2 only permits disenfranchisement for common-law felonies. In their view, disenfranchisement for statutory felonies not recognized at common law has no affirmative sanction in Section 2 and violates the Equal Protection Clause.

Three of the plaintiffs also argued that conditioning the restoration of the right to vote upon the payment of their criminal fines and restitution violates various provisions of the United States and Arizona Constitutions. Particularly, they alleged that this repayment condition violates the Equal Protection Clause of the Fourteenth Amendment, the Twenty-Fourth Amendment's bar against poll taxes, the Privileges or Immunities Clauses in both the federal and Arizona Constitutions, and the Arizona Constitution's provision mandating free and equal elections. Defendants' motions to dismiss were granted, and plaintiffs now raise these same arguments on appeal.

We consider each of these arguments and **AFFIRM**.

## Facts

This is a consolidated appeal arising from two separate suits: one on behalf of Debra L. Harvey and Catherine M. Beddard ("Harvey plaintiffs"), and another on behalf of Armando Coronado, Joseph Rubio, Michael Garza, Michele Convie, and Raymond Lewis ("Coronado plaintiffs").

The Harvey plaintiffs each have multiple felony convictions for "drug or other offenses which were not felonies at common law." Amended Complaint at 15. While they claim they would otherwise be eligible to vote, Arizona has denied them that right because of their felony convictions. They filed

a 42 U.S.C. § 1983 suit against the Governor and Secretary of State of Arizona, as well as the Pima County Recorder, challenging Arizona's disenfranchisement scheme "for denial of the vote to Plaintiffs and the consequent failure to accord them the equal protection of the laws in violation of the Fourteenth Amendment." Amended Complaint at 1. Defendants moved to dismiss the suit for failure to state a claim. They argued that Section 2 of the Fourteenth Amendment affirmatively permits the disenfranchisement of felons, that the reach of Section 2 is not limited to felonies at common law (as plaintiffs suggest), and that the plaintiffs' equal protection claims therefore fail. The District Court, adopting the Report and Recommendation of the Magistrate Judge, granted defendants' motion and dismissed the suit.

The Coronado plaintiffs also brought a § 1983 suit against the same defendants (plus the Maricopa County Recorder), alleging that they too were denied the right to vote because of convictions for offenses that, while classified as felonies under state law, did not constitute felonies at common law. Coronado and Garza were each convicted of one felony drug offense; Rubio was convicted of one felony count of attempted aggravated domestic violence; Convie and Lewis were convicted of multiple felony drug offenses. They raised the same equal protection argument as the Harvey plaintiffs with regard to Section 2.

The Coronado plaintiffs who had only one felony conviction (Coronado, Garza, and Rubio) also challenged Arizona's scheme for restoring voting rights to felons. The crux of their argument was that, because they had served the entirety of their prison terms for a lone felony conviction, the only thing keeping them from having their voting rights automatically reinstated was their failure to pay the criminal fines and restitution orders included in their sentences. *See* Ariz. Rev. Stat. § 13-912(A)(2). This, they argued, discriminates on the basis of wealth, conditions the right to vote on the payment of a fee, and violates various federal and state constitutional provi-

sions. Their complaint did not allege that any of them were incapable of paying the remainder of the money owed under their sentences. The defendants moved to dismiss the suit for failure to state a claim, and the district court granted the motion.

Plaintiffs timely filed notices of appeal, and defendants' motion to consolidate these appeals was granted.

## Discussion

We first address the argument, common to all plaintiffs, that the Equal Protection Clause only permits felon disenfranchisement when the felonies at issue were felonies at common law.

A.  *Equal Protection and the Common-Law Felony Theory of Section 2*

**[1]** Section 1 of the Fourteenth Amendment provides: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 2 further provides, in full:

> Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, *except for participation in rebellion, or other crime*, the basis of representation therein shall

be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend. XIV, § 2 (emphasis added).

**[2]** Section 2 provides an electoral penalty against States that withhold the franchise from otherwise eligible voters. If a State disenfranchises some number of otherwise eligible voters, those disenfranchised persons will count against the State's total population for purposes of determining its representation in Congress. But Section 2 lifts this penalty when disenfranchisement is based on (and this is the critical language) "participation in rebellion, or other crime." Plaintiffs argue that this language should be read as: "participation in rebellion, or other [common-law felony]." As an initial matter, it is not obvious how the scope of this Section 2 language affects a Section 1 equal protection claim; to understand that issue, we turn to the Supreme Court's opinion in *Richardson v. Ramirez*, 418 U.S. 24 (1974).

### 1. Richardson

*Richardson* involved a group of convicted felons who had served the entirety of their sentences and sought to compel California election officials to register them as voters. They had been barred from voting under a California statute which excluded from the franchise all persons previously convicted of an "infamous crime." *Id.* at 27. The California Supreme Court sustained their equal protection challenges to the California law, concluding that the disenfranchisement of convicted felons beyond the expiration of their terms of imprisonment violated the Equal Protection Clause. *Ramirez v. Brown*, 507 P.2d 1345, 1357 (Cal. 1973).

In reaching that conclusion, the California Supreme Court relied primarily upon a then-recent Supreme Court decision striking down Tennessee's durational residence requirement

as a condition on the right to vote. *Id.* at 1351-52 (discussing *Dunn v. Blumstein*, 405 U.S. 330 (1972)). In nullifying the Tennessee law at issue in *Dunn*, the Supreme Court held that "[i]t is not sufficient for the State to show that durational residence requirements further a very substantial state interest. . . . [I]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference." *Dunn*, 405 U.S. at 343. The California Supreme Court followed *Dunn*'s reasoning and concluded that "enforcement of modern statutes regulating the voting process and penalizing its misuse—rather than outright disfranchisement of persons convicted of crime—is today the method of preventing election fraud which is the least burdensome on the right of suffrage," and therefore outright disenfranchisement was not a "necessary" restriction under *Dunn*'s rationale. *Ramirez*, 507 P.2d at 1357.

**[3]** In *Richardson*, the Supreme Court reversed this judgment and, in doing so, looked primarily to Section 2 of the Fourteenth Amendment. The Court reasoned that Section 1's Equal Protection Clause could not be read to prohibit the disenfranchisement of felons because Section 2 approves of such disenfranchisement by removing any electoral penalty for it. *Richardson*, 418 U.S. at 54 ("[T]he exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment."). The Court concluded "that § 1, in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which § 2 imposed for other forms of disenfranchisement." *Id.* at 55. Today, a litigant bringing an equal protection challenge to a felon-disenfranchisement scheme must first face the formidable task of escaping *Richardson*'s long shadow. *But see Hunter v. Underwood*, 471 U.S. 222, 227, 231 (1985) (invalidating provision in Alabama Constitution authorizing disenfranchisement for persons convicted of "crimes involving moral turpitude," including misdemeanors

not punishable by imprisonment, where "discrimination against blacks, as well as against poor whites, was a motivating factor for the provision").

2. *Plain meaning and contemporary usage of "other crime"*

Plaintiffs' proposed route around *Richardson* is to argue that the affirmative sanction in Section 2 only extends to the disenfranchisement of persons convicted of common-law felonies, a category that they do not fit into. Plaintiffs identify the common-law felonies as those listed by the Supreme Court in *Jerome v. United States*, 318 U.S. 101, 108 n.6 (1943): "murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem and larceny." Plaintiffs further posit, with no support, that treason "was a common law felony of a special sort," Harvey Br. at 51, but that is inaccurate. 1 Wharton's Criminal Law § 17 (Torcia ed., 2009) ("At common law, there were three kinds of offenses: treason, felony, and misdemeanor.").[1] So plaintiffs' proposed reading of Section 2 as meaning "except for participation in rebellion, or other [common-law felony]" is off to a bad start, because it appears participation in rebellion itself would qualify not as a common-law felony, but as treason.

**[4]** And plaintiffs' interpretation is certainly not a plain reading of Section 2's terms, which permit disenfranchisement "for participation in rebellion, or other crime" without regard to whether the crime was a felony at all, much less one recognized at common law. As noted in *Richardson*, "this language was intended by Congress to mean what it says." 418 U.S. at 43.

---

[1]We could quibble further with this list—as it may be over- or under-inclusive, *see Legal Servs. for Prisoners with Children v. Bowen*, 170 Cal. App. 4th 447, 463-64 (2009)—but defendants do not dispute that plaintiffs' crimes do not qualify as common-law felonies under any definition of that phrase.

Plaintiffs' proposed reading also seems to be in direct conflict with *Richardson*, which held that California may "exclude from the franchise *convicted felons* who have completed their sentences," 418 U.S. at 56 (emphasis added), evincing no concern with whether any particular felony was one recognized at common law. Indeed, at least one of the three ex-felons in *Richardson* was convicted of a crime that was clearly not a felony at common law. *See Richardson*, 418 U.S. at 32 n.9 ("felony of heroin possession"). Still, neither this court nor the Supreme Court has directly addressed this precise question, so we consider plaintiffs' reasons for looking beyond Section 2's plain language.

Plaintiffs argue that the word "crime" at the time of the Fourteenth Amendment's drafting and ratification commonly meant "felony at common law." *Contra Kentucky v. Dennison*, 65 U.S. 66, 99 (1860) ("The word 'crime' of itself includes every offence, from the highest to the lowest in the grade of offences, and includes what are called 'misdemeanors,' as well as treason and felony."). In support of this argument, plaintiffs cite a dictionary definition and William Blackstone's Commentaries, which preceded the Fourteenth Amendment's ratification by a century. Harvey Br. at 43-44. Contemporaneousness aside, neither of these sources supports plaintiffs' position that "crime" was commonly understood as being restricted to common-law felonies.

**[5]** Webster's Dictionary defined the word "crime" in 1867 as "An act which violates a law, divine or human; . . . *But in a more common or restricted sense*, a crime denotes violation of public law, of a deeper and more atrocious nature." NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 246 (Goodrich ed., 1867) (emphasis in original). And William Blackstone observed that "in common usage the word 'crimes' is made to denote such offenses as are of a deeper and more atrocious dye; while smaller faults and omissions of less consequence are comprised under the gentler

name of 'misdemeanors' only." 4 Commentaries on the Laws of England *5 (1769).

**[6]** Noticeably absent from these definitions is any mention whatsoever of common-law felonies. While a litigant could use these definitions to support the proposition that the word "crime" in Section 2 refers only to serious crimes or felonies (such that misdemeanors would not fit within the definition), that is not plaintiffs' argument. They instead argue that in 1868 "crimes" meant "felonies at common law," and nowhere in any of the definitions is it suggested that the word "crimes" was so confined. In fact, the cited definitions plainly undermine plaintiffs' argument by omitting any reference to the common law.

Even if we were to assume *arguendo* that Section 2 is limited to serious crimes or felonies (as plaintiffs' definitions suggest), a far better reference point for determining whether a crime is serious is to look at how the crime is designated by the modern-day legislature that proscribed it, rather than indulging the anachronisms of the common law. Indeed, that is precisely the course the Supreme Court has charted in defining the contours of the right to a jury trial.

**[7]** The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. amend. VI; *see also* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury."). The Supreme Court has declined to extend this guarantee to petty offenses because such offenses were tried without a jury at common law. *See Duncan v. Louisiana*, 391 U.S. 145, 159 (1968); *Cheff v. Schnackenberg*, 384 U.S. 373, 379 (1966). But when determining what qualifies as a "criminal prosecution" that requires a jury trial, as opposed to the prosecution of a mere petty offense, the Supreme Court has rejected the rigid common-law categories and instead "sought more 'objective indications of the seriousness with which society

regards the offense.' " *Blanton v. North Las Vegas*, 489 U.S. 538, 541-42 (1989) (quoting *Frank v. United States*, 395 U.S. 147, 148 (1969)). In that context, the Supreme Court has explained:

> In fixing the maximum penalty for a crime, a legislature includes within the definition of the crime itself a judgment about the seriousness of the offense. The judiciary should not substitute its judgment as to seriousness for that of a legislature, which is far better equipped to perform the task, and is likewise more responsive to changes in attitude and more amenable to the recognition and correction of their misperceptions in this respect.

*Blanton*, 489 U.S. at 541 (citations, quotation marks, and brackets omitted).

**[8]** At bottom, plaintiffs provide absolutely no support for the proposition that the word "crimes" meant "common-law felonies" at the time of the Fourteenth Amendment's ratification. At most, they have some support for the argument that Section 2 should be limited to serious offenses, a proposition which does not help their cause because they have all been convicted of crimes currently classified as felonies.

### 3. Legislative history and the Reconstruction and Enabling Acts

With the plain meaning and contemporary usage of the word "crime" stacked against them, plaintiffs next turn to the legislative history of the Fourteenth Amendment. They find no support in the immediate drafting history or the debates surrounding the Fourteenth Amendment, which they argue should not count against them because the Supreme Court has noted that "[t]he legislative history bearing on the meaning of the relevant language of § 2 is scant indeed." *Richardson*, 418 U.S. at 43. But what little history there is regarding inclusion

of the word "crime" in Section 2 undermines plaintiffs' argument. For instance, Representative Ephraim R. Eckley of Ohio made the following observation in support of Section 2: "Under a Congressional act persons convicted of a crime against the laws of the United States, the penalty for which is imprisonment in the penitentiary, are now and always have been disfranchised." Cong. Globe, 39th Cong., 1st Sess. 2535 (1866). Like the dictionaries plaintiffs cite, this statement supports the view that "crimes" might be limited to serious crimes, or crimes the penalty for which is imprisonment in the penitentiary, but both of those categories include the plaintiffs' offenses and conflict with their common-law felony theory.

[9] Beyond this drafting history, "[f]urther light is shed on the understanding of those who framed and ratified the Fourteenth Amendment, and thus on the meaning of § 2, by the fact that at the time of the adoption of the Amendment, 29 States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes." *Richardson*, 418 U.S. at 48 & n.14 (citing state constitutions). Of the 29 State constitutions that *Richardson* referred to, it does not appear that any of them limited disenfranchisement to persons convicted of common-law felonies. *See, e.g.,* Ala. Const. art. VI, § 5 (1819) (providing for disenfranchisement of persons "convicted of bribery, perjury, forgery, or other high crimes or misdemeanors"); Conn. Const. art. VI, § 3 (1818) ("bribery, forgery, perjury, duelling, fraudulent bankruptcy, theft, or other offence for which an infamous punishment is inflicted"); Del. Const. art. IV, § 1 (1831) ("convicted of a crime deemed by law a felony"); Ore. Const. art. II, § 3 (1857) ("of any crime which is punishable by imprisonment in the penitentiary"); Va. Const. art. III, § 14 (1830) ("convicted of any infamous offence"). It would be remarkable if the many states ratifying the Fourteenth Amendment intended to nullify their own constitutional provisions, but that is exactly what plaintiffs' reading of Section 2 entails.

Finding no help in the history of the Fourteenth Amendment's ratification, plaintiffs focus their argument on the Reconstruction Act of March 2, 1867. The Reconstruction Act was enacted by the 39th Congress in 1867—nine months after the very same Congress submitted the Fourteenth Amendment to the States for ratification. Section 5 of the Act "established conditions on which the former Confederate States would be readmitted to representation in Congress." *Richardson*, 418 U.S. at 49. Section 5 of the Act provided, in part:

> That when the people of any one of said rebel States shall have formed a constitution of government in conformity with the Constitution of the United States in all respects, framed by a convention of delegates elected by the male citizens of said State, twenty-one years old and upward, of whatever race, color, or previous condition, who have been resident in said State for one year previous to the day of such election, *except such as may be disenfranchised for participation in the rebellion or for felony at common* law. . . . said State shall be declared entitled to representation in Congress, and senators and representatives shall be admitted therefrom on their taking the oath prescribed by law, and then and thereafter the preceding sections of this act shall be inoperative in said State.

14 Stat. 428, § 5 (emphasis added).[2]

Similarly, the various enabling acts used to readmit the Confederate States to representation in Congress provide, in nearly identical language, that a "fundamental condition" of

---

[2]The first ellipsis omits a number of conditions placed on the Confederate States before they would be readmitted to representation in Congress, including ratification of the Fourteenth Amendment. While those conditions are important to understanding the Reconstruction Act, and various constitutional questions surrounding it, they are not important here.

readmission is that their state constitutions shall never "be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote in said State, who are entitled to vote by the constitution thereof herein recognized, except as a punishment for such crimes *as are now felonies at common law*." 15 Stat. 73 (1868) (emphasis added) (readmitting North Carolina, South Carolina, Louisiana, Georgia, Alabama and Florida); *see also* 15 Stat. 72 (1868) (readmitting Arkansas); 16 Stat. 62 (1870) (readmitting Virginia); 16 Stat. 67 (1870) (readmitting Mississippi). Plaintiffs conclude that because the Reconstruction and Enabling Acts only permitted disenfranchisement for felonies at common law, so too must Section 2 of the Fourteenth Amendment be read to only permit disenfranchisement for felonies at common law.

**[10]** But the opposite is true. The Reconstruction Act's reference to felonies at common law only shows that when the 39th Congress meant to specify felonies at common law, it was quite capable of using that phrase. That Congress used the phrase "other crime" in Section 2, while specifying "felony at common law" in a later act, clearly indicates that the two phrases have different meanings and Congress was capable of using each when it intended to do so.

Plaintiffs' response—which is really the driving force of their entire argument—is that we must read Section 2 and the Reconstruction and Enabling Acts harmoniously and interpret them identically because to do otherwise would mean "that the Fourteenth Amendment is in direct and absolute conflict with the Reconstruction and Enabling Acts." Harvey Br. at 31. That is, if we reject plaintiffs' argument, the Fourteenth Amendment would permit what the Reconstruction Act explicitly prohibits: disenfranchisement for statutory felonies. *See* Harvey Br. at 32 ("[Section 2], as construed by the District Court, affirmatively authorizes disenfranchisement for statutory felonies. The Acts prohibit disenfranchisement for

statutory felonies. It is hard to imagine a more self-evident conflict.").

The most glaring flaw with this argument is that the absence of a constitutional prohibition does not somehow bar a statutory one. Simply because the Fourteenth Amendment does not itself prohibit States from enacting a broad array of felon disenfranchisement schemes does not mean that Congress cannot do so through legislation—provided, of course, that Congress has the authority to enact such a prohibition. Plaintiffs' confusion on this point seems to stem from language in *Richardson*, in which the Supreme Court noted that felon disenfranchisement is given an "affirmative sanction" in Section 2 of the Fourteenth Amendment. 418 U.S. at 54. But the "affirmative sanction" language in *Richardson* only means that the Equal Protection Clause of the Fourteenth Amendment does not prohibit felon disenfranchisement because Section 2 brings it outside of Section 1's prohibition. It certainly does not mean that a certain felon disenfranchisement scheme is constitutionally mandated by Section 2, as plaintiffs would read it.

Plaintiffs' reliance on the Eleventh Circuit's opinion in *Johnson v. Governor of Florida*, 405 F.3d 1214 (11th Cir. 2005), is also misguided. *Johnson* held that felon-disenfranchisement claims are not cognizable under the Voting Rights Act ("VRA"), which proscribes States from enacting voter qualifications or standards that discriminate based on race. *Id.* at 1234; 42 U.S.C. § 1973. As support for this conclusion, it reasoned that if section 2 of the VRA extended to such claims, the VRA "would prohibit a practice that the Fourteenth Amendment permits Florida to maintain." *Johnson*, 405 F.3d at 1234.

The Eleventh Circuit's point was not that the VRA would somehow conflict with Section 2 of the Fourteenth Amendment if it were interpreted to bar felon disenfranchisement, but that it would be beyond Congress's Section 5 enforcement

power. *See* U.S. Const. amend XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of [the Fourteenth Amendment]."); *see also Baker v. Pataki*, 85 F.3d 919, 930 (2d Cir. 1996) (opinion of Mahoney, J.) ("[A]ny attempt by Congress to subject felon disenfranchisement provisions to the 'results' methodology of [the VRA] would pose a serious constitutional question concerning the scope of Congress' power to enforce the Fourteenth and Fifteenth Amendments."); *Farrakhan v. Washington*, 359 F.3d 1116, 1121-25 (9th Cir. 2004) (Kozinski, J., dissenting from denial of rehearing en banc) (arguing that felon disenfranchisement claims are not cognizable under the VRA). The argument in *Johnson* was that a congressional Act prohibiting felon disenfranchisement could not be authorized under Congress's Section 5 powers because such an Act would not be enforcing the Fourteenth Amendment, which plainly permits felon disenfranchisement. *But see Farrakhan v. Washington*, 338 F.3d 1009, 1016 (9th Cir. 2003).

But the Reconstruction Act was most assuredly not enacted under the Section 5 power, as it preceded the Fourteenth Amendment's ratification by more than a year. *Cf. Oregon v. Mitchell*, 400 U.S. 112, 192 (1970) (Harlan, J., concurring in part and dissenting in part) (discussing the Reconstruction Congress's "power to interfere with state voter qualifications," positing that this power "was said to exist in a variety of constitutional provisions, including Art. I, § 2, Art. I, § 4, the war power, the power over territories, the guarantee of a republican form of government, and § 2 of the Thirteenth Amendment."). *Johnson*, therefore, is inapposite.

Finally, even if we could discern some conflict between Section 2 of the Fourteenth Amendment and the Reconstruction and Enabling Acts, plaintiffs' suggestion that this requires reading the Amendment to comport with the Acts has it exactly backward. *See* Harvey Br. at 35 ("The Fourteenth Amendment should be construed so that it is consistent with the Acts."). The canon of constitutional avoidance—providing

that a court will not pass upon a constitutional question if there is some other ground upon which the case may be disposed—is not a two-way street. There is no canon of "statutory avoidance." Courts construe statutes to avoid constitutional problems, not the other way around.

**[11]** At bottom, plaintiffs urge an interpretation of Section 2's "other crime" provision that is in extreme tension with *Richardson*, contrary to the phrase's plain meaning and its past and contemporary usage, and belied by the Fourteenth Amendment's history. In response to these failings, they offer only an imaginary constitutional dilemma accompanied by an invitation to insert language into the Fourteenth Amendment's text because of a newly conceived canon of statutory avoidance that contradicts basic principles of constitutional interpretation. We decline their invitation and reject their equal protection claim.

B. *Conditioning Restoration of the Right to Vote upon Payment of Fines and Restitution*

The three Coronado plaintiffs who have only one felony conviction (Coronado, Garza, and Rubio) also challenge Arizona's scheme for automatically restoring the right to vote to one-time felons who complete their sentences and pay any fines or restitution imposed against them. *See* Ariz. Rev. Stat. § 13-912(A). They argue that requiring felons to pay any money owed under the terms of their sentences violates the Equal Protection Clause of the Fourteenth Amendment, the bar against poll taxes in the Twenty-Fourth Amendment, the Privileges or Immunities Clauses in both federal and state constitutions, and the free and equal elections provision in Article II, § 21 of the Arizona Constitution. We address each of these claims.

**[12]** At the outset, we note two important points. First, plaintiffs acknowledge that, "once taken away the right [to vote] does not have to be restored." Coronado Br. at 15. That

is, once a felon is properly disenfranchised a state is at liberty to keep him in that status indefinitely and never revisit that determination. *See Richardson*, 418 U.S. at 26-27 (upholding California's scheme disenfranchising felons, including those who had completed the entirety of their sentences). But plaintiffs argue that "once a state adopts a scheme to restore this fundamental right, it may not require satisfaction of an unconstitutional condition." *Id.* Second, no plaintiff alleges that he is indigent, so to the extent that fact might affect the analysis, we explicitly do not address challenges based on an individual's indigent status. All we know from the allegations contained in the plaintiffs' complaint is that each of them failed to pay obligations owed under the terms of his criminal sentence.

**[13]** We begin with the equal protection claim. Plaintiffs' argument is that they have been deprived of the fundamental right to vote and that we are therefore required to review Arizona's scheme for restoring the voting rights of felons under a strict scrutiny standard. But they cannot complain about their loss of a fundamental right to vote because felon disenfranchisement is explicitly permitted under the terms of *Richardson*. 418 U.S. at 55. What plaintiffs are really complaining about is the denial of the statutory benefit of re-enfranchisement that Arizona confers upon certain felons. This is not a fundamental right; it is a mere benefit that (as plaintiffs admit) Arizona can choose to withhold entirely. Therefore, we do not apply strict scrutiny as we would if plaintiffs were complaining about the deprivation of a fundamental right.

**[14]** Even a statutory benefit can run afoul of the Equal Protection Clause, though, if it confers rights in a discriminatory manner or distinguishes between groups in a manner that is not rationally related to a legitimate state interest. *See Fields v. Palmdale School Dist.*, 427 F.3d 1197, 1209 (9th Cir. 2005) ("[G]overnment actions that do not affect fundamental rights or liberty interests and do not involve suspect

classifications will be upheld if it they are rationally related to a legitimate state interest."). For instance, a state could not choose to re-enfranchise voters of only one particular race, *see Hunter*, 471 U.S. at 233, or re-enfranchise only those felons who are more than six-feet tall. *Cf. Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) ("[T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." (citations omitted)).

**[15]** We have little trouble concluding that Arizona has a rational basis for restoring voting rights only to those felons who have completed the terms of their sentences, which includes the payment of any fines or restitution orders. Just as States might reasonably conclude that perpetrators of serious crimes should not take part in electing government officials, so too might it rationally conclude that only those who have satisfied their debts to society through fulfilling the terms of a criminal sentence are entitled to restoration of their voting rights. *See Madison v. State*, 163 P.3d 757, 771 (Wash. 2007); *see also Owens v. Barnes*, 711 F.2d 25, 27-28 (3d Cir. 1983) (scheme restoring voting rights to unincarcerated felons satisfies rational basis review). Perhaps withholding voting rights from those who are truly unable to pay their criminal fines due to indigency would not pass this rational basis test, but we do not address that possibility because no plaintiff in this case has alleged that he is indigent.

**[16]** Plaintiffs' Twenty-Fourth Amendment claim fares no better. The Twenty-Fourth Amendment provides:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States

or any State by reason of failure to pay any poll tax or other tax.

U.S. Const. amend. XXIV. Plaintiffs' right to vote was not abridged because they failed to pay a poll tax; it was abridged because they were convicted of felonies. Having lost their right to vote, they now have no cognizable Twenty-Fourth Amendment claim until their voting rights are restored. That restoration of their voting rights requires them to pay all debts owed under their criminal sentences does not transform their criminal fines into poll taxes.

**[17]** Plaintiffs next rely on the Privileges or Immunities Clause in the Fourteenth Amendment, which reads: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. Assuming for the sake of argument that the right of suffrage is one of the privileges or immunities protected by this clause, *contra Minor v. Happersett*, 88 U.S. 162, 171, 177 (1874), plaintiffs' argument fails under the exact same rationale adopted by the Supreme Court in *Richardson*: Section 1 of the Fourteenth Amendment, which includes both the Equal Protection and Privileges or Immunities Clauses, "could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which § 2 imposed for other forms of disenfranchisement." 418 U.S. at 55.

**[18]** Plaintiffs' argument based on the Arizona Constitution's Privileges or Immunities Clause fails for the same reason. *See* Ariz. Const. art. II, § 13 ("No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."). The Arizona Supreme Court has "held that this clause provides the same benefits as its federal counterpart," *Standhardt v. Super. Ct. ex rel. County of Maricopa*, 77 P.3d

451, 464 n.19 (Ariz. 2003), and plaintiffs acknowledge that its protections do not extend beyond those provided in the Fourteenth Amendment of the United States Constitution. Coronado Br. at 35. Because the Fourteenth Amendment cannot be read to prohibit Arizona's felon disenfranchisement scheme, neither can this provision of the Arizona Constitution.

**[19]** Finally, we reject plaintiffs' argument that requiring them to pay off their criminal fines and restitution orders violates the Arizona Constitution's Free and Equal Elections Clause. Ariz. Const. art. II, § 21 ("All elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."). The Arizona Constitution expressly permits felon disenfranchisement, *see* Ariz. Const. art. VII, § 2, and lest there be a conflict between these two constitutional provisions, the best reading of the Free and Equal Elections Clause is that it does not apply to disenfranchised felons, but only to those who are otherwise qualified to vote. *See Arizona ex rel. Nelson v. Jordan*, 450 P.2d 383, 386 (Ariz. 1969) (when "separate parts of a constitution are seemingly in conflict, it is the duty of the court to harmonize both so that the constitution is a consistent workable whole"). And as between felons, Arizona's statutory scheme restoring voting rights applies equally to all. All felons must complete the terms of their sentences before their voting rights are restored. Ariz. Rev. Stat. § 13-912(A).

## Conclusion

**[20]** The Fourteenth Amendment permits States to disenfranchise felons, regardless of whether their offenses were recognized as felonies at common law. Requiring felons to satisfy the terms of their sentences before restoring their voting rights is rationally related to a legitimate state interest, and does not violate any of the various constitutional provisions plaintiffs rely upon.

**AFFIRMED.**