GREAT WORKS MILLING & MANUF'G CO. (MITCHELL v.). See Case No. 9,662.

## Case No. 5,741.

### In re GREATHOUSE.

[4 Sawy. 487; 2 Abb. (U. S.) 382.] [1]

Circuit Court, N. D. California. Feb. 15, 1864.

JURISDICTION—AMNESTY PROCLAMATION.

1. The court has jurisdiction to inquire into the legality of the imprisonment of a person held under its own sentence.

2. The proclamation of the president of December 8, 1863, extends to persons who at its date had been convicted and sentenced for the offences described in it. The proclamation embraces not only rebels in arms or in a situation to injure the government, but also such as are already arrested and incarcerated. It is the duty of the court to construe the proclamation like any other public act or law, and to apply to it the well settled rules of interpretation, irrespective of any opinion, or even knowledge, of the private but unexpressed intentions of its author. A prisoner confined under a legal sentence can voluntarily accept a conditional pardon.

Application for a writ of habeas corpus. The trial and conviction of Ridgeley Greathouse, for treasonable acts, is reported [Case No. 15,254]. Application was now made, on his behalf, for a writ of habeas corpus, to procure his discharge.

Alexander Campbell and Delos Lake, for petitioner.

W. H. Sharp, U. S. Atty., for the United States.

HOFFMAN, District Judge. A writ of habeas corpus is applied for on the part of Ridgeley Greathouse, a prisoner now in execution under the judgment and sentence of this court for the crime of engaging in and giving aid and comfort to the existing Rebellion. The legality of the conviction and sentence is not denied; but it is claimed that the prisoner is entitled to his discharge under the proclamation of the president, of December 8, 1863.

The application is resisted by the district attorney on two grounds:

First. That the court has no jurisdiction to award the writ or discharge the prisoner, even though it be clear that he is within the terms of the proclamation, and,

Second. That the proclamation does not apply to his and similar cases.

1. As to the jurisdiction of the court. The authority of the courts of the United States and of the judges thereof to issue writs of habeas corpus, is derived from the fourteenth section of the act of September 24, 1789 [1 Stat. 81]. That section provides that "either of the justices of the supreme court, as well as the judges of the district courts, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment. Provided,

[1] [Reported by L. S. B. Sawyer, Esq., and by Benjamin Vaughan Abbott, Esq., and here compiled and reprinted by permission. The statement is from 2 Abb. U. S. 382, and the syllabus and opinion are from 4 Sawy. 487.]

that writs of habeas corpus shall in no case extend to prisoners in jail, unless where they are in custody under or by color of the authority of the United States, or committed for trial before some court of the same, or necessary to be brought into court to testify."

It is contended by the district attorney that the authority here given does not embrace cases where a prisoner is in custody under conviction and sentence. That the court. when sentence is pronounced, is functus officio, and has no further power over the case; that the marshal's return that he holds the prisoner by virtue of such conviction and sentence is conclusive; and that even a special pardon issued to the prisoner cannot be set up in answer to it.

For this position no authority is cited. It will be seen that, if correct, it would be the duty of the court to remand a prisoner to undergo execution of a capital sentence, even though he should produce a full and free pardon by the president. under the great seal of state. Even this result the district attorney did not hesitate to admit to be the necessary consequence of the principle contended for.

The terms of the statute embrace, it will be observed, all cases of commitment—and the proviso by implication includes not only cases of commitment for trial before some court of the United States, but also all cases where persons are in jail under or by color of the authority of the United States. It is evident that this language extends to all persons imprisoned under the authority of the United States, whether under the judgment of a court or the warrant of a committing magistrate.

The duty of the court, on the return of the writ, is plain. If it appear that the prisoner is held by virtue of a warrant issued by a competent officer, or by the judgment and sentence of a court of competent jurisdiction, he will be remanded. But if it appear that though the original commitment was lawful, yet, that in consequence of some subsequent event, his further detention is no longer lawful, he will be discharged. Thus, if he be committed until he pay a fine, which he has paid accordingly, and the return states the commitment only, the court will inquire into the fact and release the prisoner. "So, after a conviction, he may allege a pardon, or that the judgment under which he was imprisoned has been reversed." 1 Hill, 404. In People v. Cassels, 5 Hill, 167, Judge Bronson says: "The officers may also inquire whether any cause has arisen since the commitment for putting an end to the imprisonment, as a pardon, reversal of the judgment, payment of the fine, and the like."

That the court does not become, by passing sentence, functus officio, to all intents and purposes, is evident from the consideration that it is by virtue of the authority of the court and by force of its sentence that the prisoner is detained; and even when he has obtained a conditional pardon and been discharged, yet, if he violate the condition, he may be re-arrested and remanded by the court in execution of the original sentence. But the point is authoritatively settled by the supreme court of the United States.

In Ex parte Wells [Case No. 17,386], a motion was made in the circuit court for a habeas corpus on behalf of Wells, a prisoner convicted of murder and sentenced to death, but who had been pardoned by the president, upon condition that he be imprisoned during his natural life. Under this pardon, the prisoner claimed to be entitled to his discharge. The application was refused by the circuit court, and came before the supreme court by way of appeal [18 How. (59 U. S.) 307]. The questions debated were, whether the supreme court was not, in entertaining the application, exercising an original, instead of the appellate jurisdiction to which, in such cases, the constitution restricts it; and, secondly, as to the force and effect of the pardon and the legality of an imprisonment by virtue of the condition contained in it, and the prisoner's acceptance of it. It was held that the jurisdiction invoked was an appellate jurisdiction; and that the imprisonment pursuant to the condition of the pardon was legal. But no doubt seems to have been suggested—either by the court or at the bar—of the authority of the circuit court to award the writ; nor of that of the supreme court, provided the jurisdiction exercised was appellate and not original. In Ex parte Watkins, 7 Pet. [32 U. S.] 568, the court awarded the writ in the case of a person convicted of offenses against the United States, and sentenced to imprisonment and the payment of fines. It is nowhere suggested, in the case, that the authority of the circuit court, or that of the supreme court (if the jurisdiction was to be deemed appellate) to inquire into the force and effect of the sentence, and the legality of a further imprisonment under it, was open to controversy.

It is plain, from the foregoing, that it is the right and duty of the court in this case to inquire into the cause of commitment of the prisoner, and that if he is held by virtue of the sentence of this court, to ascertain and decide whether, by reason of any matter subsequent thereto, such as the payment of his fine, the expiration of his term of imprisonment, a pardon. or the like, he is now entitled to be discharged.

2. The pardon whereby it is claimed that the sentence of the prisoner is avoided is contained in the proclamation of the president of December 8, 1863. The part requisite to consider is as follows:

"Therefore, I. Abraham Lincoln, president of the United States, do proclaim. declare and make known to all persons who have directly or by implication participated in the existing Rebellion, except as hereinafter excepted, that a full pardon is granted to them.

and each of them, with restoration of all rights, if third parties shall have intervened, and upon the condition that every such person shall take and subscribe an oath, and thenceforward keep and maintain said oath, and which oath shall be registered for permanent preservation, and shall be of the tenor and effect following, to wit," etc.

The authority of the president to grant an effectual pardon to all persons embraced within the terms of this proclamation is not disputed. It is derived from the power confided to him by the constitution, and in this case is exercised in pursuance, as the preamble recites, of an express authority given by congress to the president, "to extend by proclamation to all persons who may have participated in the existing Rebellion in any state, or part thereof, pardon and amnesty, with such exceptions, and at such terms, and on such conditions as he may deem expedient for the public welfare."

The pardon and amnesty thus proclaimed is, therefore, a public and official act, of which the court will take judicial notice, and it corresponds to a class of pardons well known in England, pardons by act of parliament. Nor is it disputed that the crime described in the proclamation is the same crime as that whereof the prisoner has been convicted. The language of the proclamation is: "All persons who have directly, or by implication, participated in the existing Rebellion."

The offense of the prisoner, as charged in the indictment, is: "That he engaged in the existing Rebellion, and gave to it aid and comfort." The offense pardoned is, therefore, evidently the offense committed by the prisoner.

But it is urged by the district attorney that this proclamation does not extend to persons who, at its date, had been convicted and sentenced for the offenses described in it. In support of this position, he cites various ancient English authorities. It is not disputed that by the common law, if a man be attainted of felony, and get a pardon which doth not mention the attainder, the pardon will be ineffectual. So, also, it has been held that the pardon of a person convicted by verdict of felony, is void, unless it recite the indictment and verdict. It has even been questioned if the pardon of a person barely indicted of a felony, be good without mentioning the indictment. Bac. Abr. tit. "Pardon," D, and cases cited.

These and similar decisions are founded on the general principle that wherever it appears, by the recital of the pardon that the king was misinformed or not rightly apprised, both of the heinousness of the crime, and also how far the party stands convicted upon record, the pardon is void, upon the presumption that it was gained from the king by imposition. Any suppression of truth, or suggestion of falsehood, in a charter of pardon, was, therefore, held to vitiate it.

But it may be doubted whether, at the present day, such rules would be enforced in this country, or even in England. We learn from Barrington (Ob. St. 27, 231) that at the time of Magna Charta, and for many reigns subsequently, the abuse of the pardoning power by the king, and the impositions practiced upon him, were the subject of frequent and clamorous complaint. The ancient punishment for murder was a were gild, paid as a satisfaction to the nearest relative to the deceased. It was, therefore, a most crying abuse of power in the king not only to pardon this most heinous crime, but in consideration also of the mulct, which otherwise, should have been given to the relation who prosecuted. Bar. Ob. St. 27.

Hence, we find it enacted by statute 27 of Edw. III. that in every pardon of felony granted at any man's suggestion, the suggestion and the name of him that makes it shall be compared, and if it be found untrue the charter shall be disallowed, and the justices before whom the charges shall be alleged shall inquire of the same suggestion, and if they find it untrue shall disallow the charter. So, by statute 13 of Rich. II. it was enacted that no pardon for murder or rape shall be allowed, unless the offense be particularly specified therein, and especially in murder it shall be expressed whether it was committed by lying in wait, assault, or malice prepense.

In analogy to these statutory requirements, and to carry out the same policy, the courts held a pardon to be void whenever it might reasonably be presumed that the king was deceived; and they considered the omission to recite the fact that the person pardoned had been attained or convicted, or perhaps even indicted, as evidence that an imposition had been practiced on the king. How far these rules would now be enforced in this country is not very clear.

In Re Edymoin, 8 How. Pr. 478, a pardon was held on habeas corpus to be valid, although it appeared that a gross fraud had been perpetrated on the executive; that no notice of the application for pardon had been given to the district attorney as required by law; that the signatures of the officers of the prison to the application for pardon had been forged, as also a letter accompanying the petition purporting to be from the physician of the prison; and that on these papers the pardon was granted.

In Stetler's Case [Case No. 13,380] U. S. Cir. Ct. Phila., it was held by Judge Kane that where the pardon recited a conviction "at the June term" of the district court, of counterfeiting the silver coin of the United States, and a sentence of imprisonment for one year, and the record showed a conviction at the "May sessions" of two felonies, one counterfeiting and forging ten pieces of coin, and the other uttering and passing them, on which there was a sentence of fine as well as imprisonment—the pardon was ineffectual

to restore the competency of the party as a witness. Whart. Cr. Law, § 766, in notis.

Whether a similar inaccuracy as to the term at which the conviction was had, and the description of the offense as stated in the indictment, would, in a capital case, and in the face of the plain intention of the executive to pardon, be held to vitiate it, and the prisoner remanded for execution, may be doubted.

The case cited from the New York reports is clearly an authority that the fact that the executive was grossly deceived will not avoid the pardon; and if this be law, it follows that the omission to recite the fact of a conviction and judgment, which is in England adjudged to avoid the pardon only because it affords evidence that the king was deceived, would not have the like effect in this country. Independently of the presumption of deception, arising from a failure to recite a previous conviction or indictment, the absence of such recitals would seem to afford no ground for avoiding the pardon.

All pardons, except in cases of illegal convictions, etc., proceed upon the hypothesis of the legal guilt of the person pardoned. If he be not guilty, it is presumed that he will be acquitted, and he has no need of a pardon. The pardon is granted on considerations which satisfy the executive that, in the particular case, an offender, though guilty, should be pardoned.

It would seem, therefore, to be of slight importance, whether the guilt of the offender be judicially ascertained or not, provided the executive is fully apprised of the nature of the offense pardoned; for the pardon goes upon the presumption that the offender, if not already convicted, will be; else he would not need to plead his pardon to the indictment, but would be saved under his plea of not guilty.

It is believed, however, that in the United States few pardons have ever been granted until after conviction. But whatever be the rules with respect to private pardons by charter from the king, or special pardons by the executive in this country, it is very clear that they have no application, even in England, to general pardons by act of parliament.

This is evident on grounds of reason as well as on authority. The only reason assigned for holding void the pardon of a convict, which does not recite the conviction or indicting of a person indicted, is, that it appears from the omission that the king was not acquainted with the facts of the case. But this reason can have no application to general acts of amnesty and pardon, which are intended to include whole classes of offenders, and are in no respect founded on any consideration of the circumstances of particular cases, except of those which by name or special description may be excepted out of them.

They are like the amnesty bills passed on the accession of Henry VII. at the restoration of Charles II., and by William III. at the revolution of 1688, or in this country after the whisky rebellion, public and general acts dictated by motives of policy and considerations of state, as well as of clemency; but not founded, except as before stated, as to those excluded from their benefits, on any particular examination of the circumstances of individual cases. As to those included within their terms, there can be no reason to allege that the king was misinformed or deceived.

Neither can it, when an act of state of so great importance is contemplated, be presumed to be intended that the accidental difference in the situation of offenders—some of whom, perhaps the most guilty, may not have been arrested, or if arrested, not indicted or convicted; while others, perhaps less guilty, have been tried and convicted—should enable the former to avail themselves of the offer of grace, while the latter would be excluded. A moment's consideration of the operation of such a rule of discrimination between offenders at large and offenders in custody, will convince us of its unreasonableness.

The diligence of the district attorney has failed to discover a single case where the benefit of a general pardon, by act of parliament or by royal proclamation of amnesty, has been withheld on the ground that the party had already been convicted.

Baron Comyn says (Dig. § 53): "Also, it hath been adjudged that where an act of parliament expressly pardons such and such crimes from a certain day before the session, it thereby avoids all convictions and deprivations, and awards of costs and amerciaments for such crimes, whether such convictions were before or after the sessions, because it appears to be the intent of the parliament that such crimes shall in no way be punished which cannot take effect, if such convictions, etc., remain in force." And for this he cites numerous authorities.

It was even adjudged when a parson had been deprived for adultery, and by subsequent act of parliament, the offenses of adultery, inter alia, were pardoned, the sentence was thereby made void, and the parson reinstated in his living, notwithstanding that in the meantime, and while the deprivation stood in force, another had been admitted, instituted and inducted. 3 Coke, 6, 14. So if one be attainted of felony and afterward, by relation of a general pardon, the felony is pardoned, he shall be discharged, for he has not any remedy, by error or otherwise, to reverse the attainder. Plowd. 401a. It even seems that the ancient fiction by which acts of parliament were deemed to relate to the first day of the session, has been allowed to give a retrospective effect to an act of pardon enacted during the session, and to make utterly void sentences passed before the passage of the act.

On these authorities, and for the reasons assigned above, it appears to me indisputable that where by act of parliament or by royal proclamation of amnesty, certain kinds of offenses or classes of offenders, are pardoned, all offenders embraced within the description, and all persons included within the classes designated are, unless specially excepted, entitled to the benefit of the pardon.

If there be any case where the benefit of such a pardon or amnesty has been refused to a person otherwise within it, on the ground that his guilt had already been judicially ascertained, I have failed to discover it.

It is suggested by the district attorney that the proclamation was intended to apply only to rebels in arms, or in a situation to injure the government, and not such as are already arrested and incarcerated. But the language of the proclamation expresses no such limitation. A full pardon is granted "to all persons who have directly, or by implication, participated in the existing Rebellion."

It therefore includes not only those who have joined the Rebellion in arms, but those who have in any way been implicated in it. I know of no rule of construction which would authorize a court to interpolate into the language of a statute or public act a qualification such as is suggested by the district attorney.

It may be observed, in addition, that the interpretation contended for would degrade what was evidently intended as an act of mercy and conciliation into a mere bargain, by which the president barters away impunity for crime in consideration of an exemption from future attacks upon the government; and that it makes his clemency merely commensurate with his apprehensions. The active and dangerous rebel is to be pardoned if he will renounce his treasonable designs; but the terrors of the law are unmitigated for the impotent and harmless rebel, who is not formidable enough to be entitled to forgiveness. Such a construction of the proclamation seems to me too repugnant to reason and sound policy to be for a moment admitted.

It was also urged by the district attorney, that the president has himself given a practical construction to his proclamation, by issuing to Albert Rubery, a co-defendant with the petitioner, a special pardon, thereby showing that he did not consider him within the purview of the proclamation.

It has even been suggested that there are good, though private, grounds for the belief that the case of the Chapman prisoners was not intended by the president to be covered by the proclamation. But it is to be observed that the pardon of Rubery was granted as a mark of respect and good will to Mr. Bright, by whom it had been solicited, and on condition that Rubery should leave the country within thirty days. As Rubery was a British subject, the oath, the taking of which is the condition imposed by the proclamation, could not have been exacted of him, and he might thus, if unwilling to take it, have been deprived of the general pardon.

Whether or not the failure to except the case of the Chapman prisoners from the operation of the general terms of the proclamation arose from accident or inadvertence, the court cannot judicially know. Its plain duty is to construe the proclamation like any other public act or law, and to apply to it the well-settled rules of interpretation, irrespective of any opinion, or even knowledge, of the private but unexpressed intention of its author. Such is the rule even with respect to a private pardon of an individual offender. "A pardon," says Mr. Chief Justice Marshall, "is an act of grace proceeding from the power intrusted with the execution of the laws which exempts the individual on whom it is bestowed from the punishment the law inflicts for the crime he has committed. It is the private, though official act, of the executive magistrate delivered to the individual for whose benefit it is intended, and not communicated officially to the court. It is a constituent part of the judicial system that the judge sees only with judicial eyes, and knows nothing respecting any particular case of which he is not informed judicially. A private deed not communicated to him, whatever may be its character, whether a pardon or release, is totally unknown and cannot be acted on. The looseness which would be introduced into judicial proceedings would prove fatal to the great principles of justice, if the judge might notice and act upon facts not brought regularly into the cause. Such a proceeding in ordinary cases would subvert the best established principles, and overturn those rules which have been settled by the wisdom of ages."

"Is there anything peculiar in a pardon which ought to distinguish it in this respect from other facts? We know of no legal principles which will sustain such a distinction. * * * The pardon may possibly apply to a different person or a different crime. It may be absolute or conditional. It may be controverted by the prosecutor, and must be expounded by the court. These circumstances combine to show that this, like any other deed, ought to be brought judicially before the court by plea, motion or otherwise." U. S. v. Wilson, 7 Pet. [32 U. S.] 161.

In the case in which these observations were made, the prisoner had declined to avail himself of a pardon which he had received. It was held that the court could not judicially notice the pardon, unless produced and brought before it. But if the court, though aware that a pardon has been granted, cannot know of its existence until it is judicially brought before it, how can it, when the pardon is produced, be governed in its construction or the expounding of its effect

by any extrinsic fact of which judicially it is ignorant? And especially in the case of a general pardon by proclamation or act of legislature, of which the court takes judicial notice, must it dismiss all knowledge of the intentions of the pardoning power, except such as is to be derived from the terms of the act of grace itself.

Finally, it is urged by the district attorney that the proclamation, or pardon contained therein, is of the nature of a contract, by which the president remits the punishment for the offense, in consideration of the oath to be taken by the offender that he will support the constitution. That the petitioner, being in prison and under duress, could not take such an oath, nor was he in a position to render the consideration exacted by the proclamation before its provisions can be availed of. This view of the proclamation has already been considered. It is not a contract between equals, each receiving an equivalent for what he surrenders. It is an act of clemency, grace, and conciliation. Its condition was intended, not as a consideration, but merely to exclude from its benefits the obdurate, and those who are not willing to renounce the future commission of the same offenses. The duty of supporting the constitution is of paramount obligation on every American citizen. The promise or the oath to perform this duty is no more a good or a valuable consideration for the remission of penalties incurred by its previous violation, than repentance and a resolution to amend are considerations for the forgiveness of all sins promised on those conditions by the divine goodness.

That a conditional pardon accepted by a convict is deemed to be accepted voluntarily, and not under duress per minas, or by imprisonment, has been expressly adjudged by the supreme court. "As to the suggestion that conditional pardons cannot be considered as being voluntarily accepted by convicts so as to be binding on them, because they are made while under duress per minas and duress of imprisonment, it is only necessary to remark that neither applies to this case, as the petitioner was legally in prison." Ex parte Wells, 18 How. [59 U. S.] 315.

If the petitioner in the case at bar had been sentenced to death, and had accepted a pardon which commuted his punishment to imprisonment for life, his acceptance would, under this decision, have been deemed voluntary, and his imprisonment for life legal. Can it be contended that when the condition is that he shall take an oath which binds him to discharge his duties as a citizen, and to refrain from the further committing of treason, his acceptance of the pardon is not voluntary and legal?

How far the promise of the petitioner, or any other person who may accept the conditions of the proclamation is sincere, and expresses a real determination to fulfill it, we cannot know. The president has seen fit to invite all persons guilty of treason (with certain exceptions) solemnly to assume anew their obligations as citizens, and, as an inducement, he has offered them pardon for past offenses. It appears to me plain that all persons not included in the excepted classes are to be deemed to be pardoned, on their complying with the required condition.

I have thus noticed, I believe, every objection or suggestion urged by the district attorney, to show that the petitioner is not within the operation of the proclamation. My conclusion is, that the punishment to which he was sentenced has been remitted by the executive, and his offense pardoned. He is consequently entitled to the writ prayed for, on the return of which, if nothing further appears, he must be discharged.

I reach this conclusion not without reluctance. The crime of the prisoner has been grave, for it involved not only the violation of the duty he owed as an American citizen to this country, but the breach of the allegiance he owed to this state, of which he has long been a resident and citizen, as well as an intended outrage upon his neighbors and fellow-citizens, whose property he proposed to plunder. I am perhaps justified in assuming that if the special circumstances of this case had been brought to the attention of the president, or had been in his mind when he was framing his proclamation, the petitioner and his associates would probably have been excepted from its operation. But my duty is to administer the law, and to construe this proclamation like a public statute, according to its terms and legal import. I am not at liberty to withhold its benefits from any persons embraced by its terms, whether they have been so embraced by inadvertence or design.