**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1791**

———————

GEORGE HAWKINS,

        Plaintiff - Appellant,

v.

GLENN YOUNGKIN, in his official capacity as Governor of Virginia; KELLY GEE, in her official capacity as Secretary of the Commonwealth of Virginia,

        Defendants - Appellees.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  John A. Gibney, Jr., Senior District Judge. (3:23-cv-00232-JAG)

———————

Argued:  May 9, 2025                                             Decided:  August 20, 2025

———————

Before WYNN, HARRIS, and BENJAMIN, Circuit Judges.

———————

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge Harris and Judge Benjamin joined.

———————

**ARGUED:**  Jonathan Sherman, FAIR ELECTIONS CENTER, Washington, D.C., for Appellant.  Erika L. Maley, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.  **ON BRIEF:**  Victor M. Glasberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia; Michelle Kanter Cohen, Nina G. Beck, Emily P. Davis, FAIR ELECTIONS CENTER, Washington, D.C., for Appellant. Jason S. Miyares, Attorney General, Steven G. Popps, Chief Deputy Attorney General, Kevin M. Gallagher, Principal Deputy Solicitor General, Rick W. Eberstadt, Deputy

Solicitor General, Meredith L. Baker, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia; Charles J. Cooper, Haley N. Proctor, John D. Ramer, COOPER & KIRK, PLLC, Washington, D.C., for Appellees.

———————

WYNN, Circuit Judge:

Virginia's Constitution automatically strips individuals convicted of felony offenses of the right to vote but vests in the Governor the discretionary power to restore those rights. George Hawkins, previously convicted of a felony, petitioned to have his voting rights restored. So far, Governor Glenn Youngkin has declined to do so.

Hawkins brought this 42 U.S.C. § 1983 action against Governor Youngkin and Secretary of the Commonwealth Kelly Gee[1] in their official capacities, asserting two First Amendment claims: (1) that the Governor's unfettered discretion over voting-rights restoration violates the Constitution, and (2) that the lack of a reasonable, definite time limit for the restoration process likewise offends the First Amendment. The district court granted summary judgment for the Commonwealth officials.

Because the district court correctly rejected Hawkins's claims, we affirm.

I.

A.

Article II, Section 1 of Virginia's Constitution provides that "[n]o person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1. And among the clemency powers it vests in the Governor is the ability "to remit fines and penalties under such rules and regulations as may be prescribed by law; to grant reprieves and pardons after conviction except when the prosecution has been carried on by the House of

---

[1] Although Gee is a named defendant in this action, for simplicity, we refer throughout this opinion primarily to the Governor.

3

Delegates; [and] *to remove political disabilities* consequent upon conviction for offenses[.]" *Id.* at art. V, § 12 (emphasis added). The term "political disabilities" encompasses a broad array of rights, one of which, and most relevant here, is the right to vote. *See Howell v. McAuliffe*, 788 S.E.2d 706, 710 n.1 (Va. 2016).

The power of the Governor to grant clemency has been part of Virginia's Constitution since 1776, but the specific power to "remove political disabilities consequent to conviction of offenses" was not added until its 1870 Constitution. *Gallagher v. Commonwealth*, 732 S.E.2d 22, 25 (Va. 2012) (paraphrasing 2 A.E. Dick Howard, *Commentaries on the Constitution of Virginia* 642 (1974)). To rejoin the Union following the Civil War, the Commonwealth was required to ratify a new constitution,[2] and the 1870 Constitution was drafted in light of the Fourteenth Amendment's "implicit authorization . . . to deny the vote to citizens 'for participation in rebellion, or other crime.'" *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (quoting U.S. Const. amend. XIV, § 2).

The Supreme Court of Virginia has emphasized that "the power to remove the felon's political disabilities remains vested solely in the Governor, who may grant or deny

_____

[2] Nearly two years after the ratification of the Fourteenth Amendment, Congress passed an act establishing the "fundamental conditions" for Virginia's readmission to the Union, including that "the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, *excepted as a punishment for such crimes as are now felonies at common law*, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State." An Act to Admit the State of Virginia to Representation in the Congress of the United States, ch. 10, 16 Stat. 62, 63 (1870) (emphasis added).

any request without explanation, and there is no right to appeal from the Governor's decision." *In re Phillips*, 574 S.E.2d 270, 273 (Va. 2003). It has also held that clemency powers should be exercised "on an individualized case-by-case basis taking into account the specific circumstances of each." *Howell*, 788 S.E.2d at 718.

B.

In December 2022, following his assumption of office earlier that year, Governor Youngkin implemented a new process for voting-rights restoration.[3] Under the current system, applicants must complete a Restoration of Rights form, which is available online and included in materials provided to individuals released from incarceration after December 9, 2022.[4] The Restoration of Rights Division of the Office of the Secretary of the Commonwealth reviews the application for "accuracy, completeness, eligibility, and

---

[3] Information about the current process for felon re-enfranchisement is drawn from the parties' Joint Stipulation of Undisputed Facts.

[4] The Restoration of Rights form requests the following information:

(a) full legal name; (b) full name when convicted; (c) Social Security Number; (d) date of birth; (e) gender (male/female); (f) street address; (g) phone number; (h) email address; (i) court of conviction (Virginia Circuit Court, Out of State Circuit Court, Military Court, Federal Court); (j) citizenship status; (k) whether the applicant has been convicted of a violent crime, and if so, the crime and date of conviction; (1) whether the applicant has completed serving all terms of incarceration; (m) whether the applicant is currently on probation, parole, or other state supervision, and if so, the expected end date; and (n) checkbox requiring applicant to indicate either that they have "paid all fines, fees, and restitution" or that they are "currently paying my fines, fees, and restitution" with a receipt or payment plan from the court attached.

J.A. 140. (Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.)

previous restorations." J.A. 141. The Restoration of Rights Division contacts applicants with incomplete applications to give them an opportunity to provide missing data or documentation; if the applicant fails to do so, the application is not further processed.

The Restoration of Rights Division then determines the nature of the conviction. To do so, it orders criminal-record checks from a database operated by the Virginia State Police. If an applicant has not been convicted of a felony in a Virginia court, the Restoration of Rights division informs them of this. If an applicant indicates that they have been convicted in a federal court, the Restoration of Rights Division contacts the applicant through email to request documentation concerning the date they were released from incarceration or completed supervised release.[5]

Next, the Restoration of Rights Division seeks information from four Virginia agencies. From the Department of Elections, it learns whether the applicant is in its records, and, if so, whether the applicant is deceased, mentally incapacitated, or a non-citizen. From the Department of Behavioral Health and Development Services, it learns whether the applicant is or has been incarcerated in a state mental hospital, is on supervised release from such a hospital, or has been found not guilty by reason of insanity. From the Department of Corrections, it learns whether the applicant is incarcerated in a prison or a local jail, on community supervision, an absconder or fugitive, or under interstate compact community supervision. And from the Compensation Board, it learns whether the applicant

---

[5] Though the Joint Stipulations of Undisputed Facts does not describe how the Restoration of Rights Division pursues information about out-of-state convictions, a declaration from the Deputy Secretary of the Commonwealth appears to suggest that such convictions follow the same process as that used for federal convictions. *See* J.A. 327–30.

6

is a current inmate for a federal or state offense, has been released to an out-of-state authority, is awaiting trial, has been released to a mental hospital, is on supervised release, or is bonded and being supervised by pre-trial services.

The Restoration of Rights Division screens out applicants who do not meet voting qualifications under Virginia law, based on, for instance, age, citizenship status, or residence; who did not submit complete applications; who failed to respond to inquiries from the Restoration of Rights Division; who are still incarcerated; who are subject to a pending felony charge; or who are on supervised release for an out-of-state or federal conviction.

Following this review, the Secretary of the Commonwealth makes a recommendation to the Governor as to the disposition of the application. Governor Youngkin represents that the ultimate disposition of the individual's restoration application is based on his "predictive judgment regarding whether an applicant will live as a responsible citizen and member of the political body." J.A. 118–19.

## C.

Hawkins tried, unsuccessfully, to have his voting rights restored through this system following his May 2023 release from state prison for a felony offense. Because he was convicted as a minor, Hawkins has never been able to exercise the franchise. He wishes to express his political preferences by voting for constitutional amendments and in future primary and general elections. To facilitate this, he has submitted at least one application

7

for voting-rights restoration.[6] His efforts have been rebuffed.

In July 2023, Hawkins joined this lawsuit, which had, at that time, been ongoing for several months. (The original plaintiffs are no longer involved in the litigation.) The complaint alleges that the discretion accorded to Virginia's Governor for deciding whether to restore the voting rights of someone previously convicted of a felony violates the unfettered-discretion doctrine of the First Amendment. In general terms, this doctrine forbids administrators from exercising unfettered discretion over whether to grant licenses that implicate an individual's First Amendment rights. The district court found the doctrine to be inapplicable because licensing schemes "describe systems that function to regulate how a person can exercise[] an existing right" whereas the function of Virginia's voting-restoration system is to "determine[] who can reenter the franchise." *Hawkins v. Youngkin*, No. 3:23-cv-232, 2024 WL 3732462, at *5 (E.D. Va. Aug. 7, 2024). So it granted summary judgment to the Governor. Hawkins timely appealed.

## II.

The preliminary question for this Court is whether we may wade into this dispute over the Governor's clemency power at all. A review of the history of the clemency power, and the more general pardon power, reveals that constraints over such powers have

---

[6] Hawkins contends he submitted two applications, the first in early May 2023 and the second in June 2023. The Deputy Secretary of the Commonwealth represents that only the June 2023 application was received. Regardless, Hawkins raises a facial challenge to the system under the First Amendment's unfettered-discretion doctrine. Under that doctrine, "one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988). Hawkins has applied for restoration at least once, and this challenge would continue even if he had not, so we need not resolve this dispute.

traditionally been politically, not judicially, imposed. But precedent and history also make clear that this appeal falls into the narrow subset of cases where judicial review is appropriate.

Chief Justice Marshall long ago identified English practice as the starting point for understanding the contours of the pardon power and the role of the judiciary therein, observing that "[a]s this power had been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance; we adopt their principles respecting the operation and effect of a pardon." *United States v. Wilson*, 32 U.S. (7 Pet.) 150, 160 (1833).

English use of the pardon power can be traced to the eighth century. *Herrera v. Collins*, 506 U.S. 390, 412 (1993). The power was held in such esteem that Blackstone considered that "one of the great advantages of monarchy in general, above any other form of government[, is] that there is a magistrate, who has it in his power to extend mercy, wherever he thinks it is deserved: holding a court of equity in his own breast, to soften the rigour of the general law, in such criminal cases as merit an exemption from punishment." 4 William Blackstone, *Commentaries* *397, quoted in *Herrera*, 506 U.S. at 412.

This is not to say that the English monarch's use of the pardon power was always cause for popular celebration. As one mid-nineteenth-century court noted, "at the time of Magna Charta, and for many reigns subsequently, the abuse of the pardoning power by the king, and the impositions practiced upon him, were the subject of frequent and clamorous complaint." *In re Greathouse*, 10 F. Cas. 1057, 1059 (C.C.N.D. Cal. 1864); *see, e.g.*, William Shakespeare, *Richard II* act 5, sc. 3, ll. 83–84 (Duke of York warning King Henry

9

IV, "If thou do pardon whosoever pray, / More sins for this forgiveness prosper may."); William Shakespeare, *Measure for Measure* act 2, sc. 4, ll. 120–21 (Isabella, recognizing that Angelo is attempting to use the offer of a pardon to spare her brother's life as a means of coercion, observing, "[L]awful mercy / Is nothing kin to foul redemption."). Because of "potential or actual abuses [that] were perceived," the history of the pardon power in England "reveals a gradual contraction to avoid its abuse and misuse."[7] *Schick v. Reed*, 419 U.S. 256, 260 (1974).

At the Constitutional Convention, the Framers had to decide how closely to follow the English tradition. Although neither the Virginia Plan nor the New Jersey plan addressed pardons, the delegates quickly decided to lodge this power in the Executive. *See* 1 Max Farrand, *The Records of the Federal Convention of 1787*, at 20–23 (1911) (Virginia Plan); *id.* at 242–45 (New Jersey Plan). Roger Sherman proposed obliging the President to seek consent of the Senate to effectuate a pardon, but that proposal was quickly defeated. *See* 2 Max Farrand, *The Records of the Federal Convention of 1787*, at 419 (1911). So, the Supreme Court has observed, "the pardoning power was intended to be generally free from legislative control." *Schick*, 419 U.S. at 263.

Alexander Hamilton explained the rationale for lodging the clemency power in a single person. "As the sense of responsibility is always strongest in proportion as it is

---

[7] Such pre-Revolution limitations on the pardon power included that the king could not pardon those in prisons outside of the realm, an offense which resulted in private loss to another, an unredressed common nuisance, or an offense against a popular or penal statute after an information was brought, and could not use the pardon power to undermine parliamentary impeachment. 4 William Blackstone, *Commentaries* *398–99.

undivided, it may be inferred that a single man would be most ready to attend to the force of those motives which might plead for a mitigation of the rigor of the law, and least apt to yield to considerations which were calculated to shelter a fit object of its vengeance." *The Federalist No. 74*, at 447–48 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Moreover, "[t]he reflection that the fate of a fellow-creature depended on his sole fiat, would naturally inspire scrupulousness and caution; the dread of being accused of weakness or connivance, would beget equal circumspection, though of a different kind." *Id.* at 448.

Thus, the federal pardon power was located entirely in the President, and political accountability became the primary means for restraining that power. So, as a general rule, "[i]f the clemency power is exercised in either too generous or too stingy a way, that calls for political correctives, not judicial intervention." *Cavazos v. Smith*, 565 U.S. 1, 9 (2011) (per curiam). For this reason, "pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981).

Of course, nothing compels States to vest similar power in the executive—or even to establish the power at all. *Herrera*, 506 U.S. at 414. Yet, clemency has been widely available in the States since they came into existence. *Id.* States initially hesitated to grant such power to the executive, and some have opted to divide the power between the Governor and an advisory board selected by the legislature. But, over time, the power has

11

shifted in the direction of exclusive executive control.[8] *Id.* That is where it lies under Virginia's current Constitution. *See* Va. Const. art. V, § 12.

While most States lodge the power of *clemency* in the executive, they typically take a different approach with re-enfranchisement decisions, often not treating them as falling under the clemency power at all. States may constitutionally disenfranchise felons, and the Constitution does not require States to ever restore those voting rights once lost, even after a person has completed their sentence and any period of parole. *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974). But all States provide a path to re-enfranchisement, and in most, re-enfranchisement occurs automatically at some point.

Specifically, as of 2024, in Vermont, Maine, Puerto Rico, and the District of Columbia, those who were incarcerated for felonies never lost their right to vote in the first place. *See* C.R. Div., U.S. Dep't of Just., *Guide to Voting Rules that Apply After a Criminal Conviction* (rev. Sept. 2024), https://www.justice.gov/usdoj-media/crt/media/1332106/dl?inline [https://perma.cc/HHJ7-VPPN]. Twenty-five States automatically restored voting rights for most individuals upon their release from prison, although eight of those

---

[8] The Commonwealth of Virginia is a prime example of a State that vacillated between vesting the power exclusively in the executive and dividing the power. Its first Constitution vested in the Governor "the power of granting Reprieves or pardons"—"with the advice of the Council of State." Va. Const. (1776). The Council of State, sometimes known as the Privy Council, was an eight-member body elected by a joint ballot of both houses. Virginia's third Constitution eliminated the Council of State and vested the whole of the pardon power in the Governor. *See* Va. Const. art. V, § 5 (1851) ("[The Governor] shall have power . . . to grant reprieves and pardons after conviction[.]"). A 1928 amendment to Virginia's 1902 Constitution permitted the General Assembly to create, and the Governor to appoint, a pardon board. *See* Va. Const. art. V, § 73 (1902). Under Virginia's current Constitution, adopted in 1971, the pardon power again lies exclusively with the Governor.

States provided differing requirements if the individual had been convicted of an election-related offense. *Id.* In twelve other States, individuals became eligible for automatic voter-rights restoration after completing their sentences (sometimes with a brief waiting period), including parole, probation, and (in some States) the payment of any unpaid debts related to the offense. *Id.* Eight more States listed enumerated offenses that required an individual to apply for restoration, generally from an entity in the executive branch. *Id.*

Three States—Iowa, Kentucky, and Virginia—indefinitely stripped those convicted of felonies of their right to vote and obliged them to seek restoration from the Governor. But the Governors of the first two States have enacted Executive Orders providing for automatic restoration in most circumstances. *Id.* at 45–51; *see* Iowa Exec. Order No. 7 (Aug. 5, 2020); Ky. Exec. Order No. 2019-003 (Dec. 12, 2019). As of 2024, Virginia was the lone State that disenfranchised everyone convicted of a felony, placed re-enfranchisement decisions entirely within the Governor's pardon power, and did not provide for automatic restoration for any class of convictions.[9, 10] As discussed, decisions

---

[9] The Virginia General Assembly has initiated the process to amend the Virginia Constitution to provide that every person convicted of a felony shall, "upon release from incarceration for that felony conviction and without further action required of him, . . . be invested with all political rights, including the right to vote." 2025 Va. Acts Ch. 601. In order for this amendment to become part of the Virginia Constitution, the next General Assembly must also agree to it before it is submitted to the voters for their approval. Va. Const. art. XII, § 1.

[10] This Court is aware of ongoing litigation in the Eastern District of Virginia where plaintiffs contend that federal law prohibits Virginia from disenfranchising individuals for offenses that would not have been considered felonies at common law in 1870. *See* Second Am. Compl., *King v. Youngkin*, No. 3:23-cv-408 (E.D. Va. Apr. 4, 2024). This opinion expresses no view on whether the Commonwealth may categorically disenfranchise individuals for any felony conviction.

13

related to the exercise of such power are typically not subject to judicial review.

Still, there are limitations to this general rule.[11] Most obviously, when a State creates a right, due process may entitle individuals to certain procedural protections. Or, as the Supreme Court put it, "[a] state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right." *Dumschat*, 452 U.S. at 463. So, for example, if a State creates objective criteria, the completion of which is supposed to result in restoration of voting rights, due process protections preclude State actors from imposing improper procedural hurdles beyond those objective criteria.

Further, even in the absence of State-created rights, the Supreme Court has instructed that "some *minimal* procedural safeguards apply to clemency proceedings." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring

---

[11] The following discussion focuses on judicial review of State exercises of the clemency power. On the federal side, this Court has observed that "[t]he President's clemency power is not only expansive, but also exclusive[, so n]either the legislative nor the judicial branches can exercise or alter it." *Rosemond v. Hudgins*, 92 F.4th 518, 525 (4th Cir. 2024). Because of this general rule, "the Judiciary's role in the matter of executive commutations is very sharply circumscribed." *Id.* at 526. Still, there are judicially enforceable limitations even in the federal context. For instance, the Supreme Court has determined that a pardon cannot be issued for an offense that has not yet occurred. *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 380 (1866). Nor may a pardon be used to affect rights vested in a third party. *Knote v. United States*, 95 U.S. 149, 154 (1877). In order to be valid, a pardon must be accepted by the recipient, so it cannot be used to make an unwilling witness forgo their right against self-incrimination. *Burdick v. United States*, 236 U.S. 79, 91 (1915); *see Wilson*, 32 U.S. at 161 ("[A pardon] may then be rejected by the person to whom it is tendered; and if it be rejected, we have discovered no power in a court to force it on him."). *But see Biddle v. Perovich*, 274 U.S. 480, 487 (1927) (declining to let habeas petitioner refuse a commutation of a capital sentence to a life sentence because "[s]upposing that [the petitioner] did not accept the change, he could not have got himself hanged against the Executive order"). The Supreme Court has also made clear that the pardon power does not permit the President to commute sentences on conditions which "in themselves offend the Constitution." *Schick*, 419 U.S. at 264.

14

in part and concurring in the judgment).[12] For this reason, "[j]udicial intervention might . . . be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id.*

Judicial review and intervention are not limited to due-process issues. As Governor Youngkin rightly acknowledges, a scheme where the decision to re-enfranchise felons was based on race would violate the Fourteenth and Fifteenth Amendments. Response Br. at 40–41; *e.g.*, *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (O'Connor, J.) ("[A] state could not choose to re-enfranchise voters of only one particular race." (citing *Hunter*, 471 U.S. at 233)); *Jones v. Governor of Fla.*, 975 F.3d 1016, 1030 (11th Cir. 2020) (en banc) ("Although States enjoy significant discretion in distributing the franchise to felons, it is not unfettered. A State may not rely on suspect classifications in this area any more than in other areas of legislation.").

Similarly, basing re-enfranchisement on political affiliation—or other such

---

[12] Even though Justice O'Connor wrote for only four justices, Justice Stevens, writing separately, agreed with her analysis. Thus, her opinion on this point has long been considered controlling. *See, e.g.*, *Creech v. Idaho Comm'n of Pardons & Parole*, 94 F.4th 851, 855 n.1 (9th Cir.) (per curiam), *cert. denied*, 144 S. Ct. 1027 (2024); *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1294 (11th Cir. 2020); *Winfield v. Steele*, 755 F.3d 629, 630 (8th Cir. 2014) (en banc) (per curiam); *see also Harvey v. Horan*, 285 F.3d 298, 313–14 (4th Cir. 2002) (Luttig, J., statement respecting the denial of rehearing en banc); *Knight v. Florida*, 528 U.S. 990, 991 (1999) (Thomas, J., concurring in denial of certiorari) (noting that "five Members of [the Supreme] Court [took the view] that procedural due process principles govern a clemency hearing in which the clemency decision is entrusted to executive discretion" (footnote omitted)). We adopt this consensus view. For simplicity, this opinion will hereafter cite to the binding portions of Justice O'Connor's analysis without a parenthetical denoting that the citation is to her opinion.

15

viewpoint discrimination—would run afoul of the First Amendment. Response Br. at 41; *see Woodard*, 523 U.S. at 292 (Stevens, J., concurring in part and dissenting in part) ("[N]o one would contend that a Governor could ignore the commands of the Equal Protection Clause and use race, religion, or political affiliation as a standard for granting or denying clemency."); *Hand v. Scott*, 888 F.3d 1206, 1211–12 (11th Cir. 2018) ("[A] discretionary felon-reenfranchisement scheme that was facially or intentionally designed to discriminate based on viewpoint—say, for example, by barring Democrats, Republicans, or socialists from reenfranchisement on account of their political affiliation—might violate the First Amendment[.]").

Additionally, numerous circuits have held that rational-basis review applies to Equal Protection claims related to felon re-enfranchisement. *See Hayden v. Paterson*, 594 F.3d 150, 170 (2d Cir. 2010); *Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983); *Williams v. Taylor*, 677 F.2d 510, 514 (5th Cir. 1982); *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010); *Harvey*, 605 F.3d at 1079 (9th Cir.); *Jones*, 975 F.3d at 1029–30 (11th Cir.). This is because, while the right to vote is normally a fundamental right subject to strict scrutiny if severely restricted, *see Burdick v. Takushi*, 504 U.S. 428, 434 (1992), felons "cannot complain about their loss of a fundamental right to vote because felon disenfranchisement is explicitly permitted" by Supreme Court precedent, *Harvey*, 605 F.3d at 1079. Nevertheless, while rational-basis review might be minimal, it provides some protection. As Justice O'Connor wrote for a Ninth Circuit panel, "a state could not choose to . . . re-enfranchise only those felons who are more than six-feet tall" because this act would "distinguish[] between groups in a manner that is not rationally related to a

16

legitimate state interest." *Id.*

The Governor also recognizes that analogous Virginia laws prevent re-enfranchisement decisions "on the basis of suspect classifications or the exercise of fundamental rights, such as race, religion, sex, and viewpoint." J.A. 118. As the Supreme Court of Virginia has recognized, the clemency power "may be broad, but it is not absolute." *Howell*, 788 S.E.2d at 710.

Nevertheless, the Governor marshals the decision in *Beacham v. Braterman* to suggest that this Court may not review a voter-restoration scheme at all. 300 F. Supp. 182 (S.D. Fla.), *aff'd*, 396 U.S. 12 (1969) (per curiam). But that case does not require such a result.

In *Beacham*, a three-judge district-court panel evaluated whether a system in which the Governor could "restore discretionarily the right to vote to some felons and not to others" violated Equal Protection or Due Process. *Id.* at 184. It concluded that it did not. *Id.* The panel further adopted the broad rule that "[w]here the people of a state have conferred unlimited pardon power upon the executive branch of their government, the exercise of that power should not be subject to judicial intervention." *Id.* The Supreme Court summarily affirmed in a one-sentence, per curiam order. 396 U.S. at 12.

*Beacham* should not be—and has not been—read to be so expansive as to preclude all challenges to a system of felon disenfranchisement or re-enfranchisement. "[T]he precedential effect of a summary affirmance can extend no farther than the precise issues presented and necessarily decided by those actions," which in *Beacham* were merely whether the challenged system violated Equal Protection or Due Process. *Ill. State Bd. of*

17

*Elections v. Socialist Workers Party*, 440 U.S. 173, 182 (1979) (cleaned up). More importantly, "since *Beacham*, the Supreme Court has recognized that, at least in limited circumstances, a state's pardon power may be cabined by judicial decree." *Hand*, 888 F.3d at 1209.

Indeed, years after summarily affirming *Beacham*, the Supreme Court unanimously permitted disenfranchised voters to challenge the disenfranchisement provision in Alabama's Constitution as a violation of equal protection. *Hunter*, 471 U.S. at 225; *see id.* at 231–32 (examining the history of Alabama's 1901 Constitutional Convention and determining that a "racially discriminatory motivation" was "a motivating factor" for the disenfranchisement of persons convicted of any crime "involving moral turpitude" (quoting Ala. Const. art. VIII, § 182 (1901))). And more than a decade after that, in *Woodard*, no justice questioned whether inmates challenging state clemency proceedings could bring their claims, and a majority of the justices found that at least a minimal amount of procedure was required during those proceedings. 523 U.S. at 289.

The foregoing shows that a State executive's use of the pardon power—including to restore voting rights—may be judicially reviewed in at least certain narrow circumstances, including where a plaintiff alleges that the use of the pardon power flouts a State-created process, is arbitrary, engages in suspect classifications, or violates the First Amendment. Because Hawkins raises a claim sounding in the First Amendment, we proceed to review his claim.

## III.

Hawkins contends that the entirely discretionary nature of Virginia's voting re-

18

enfranchisement system—both in whether the Governor opts to restore a particular individual's voting rights, and in how long he takes to make that decision—facially violates the First Amendment's unfettered-discretion doctrine. We review the district court's grant of summary judgment de novo, and we affirm. *Philpot v. Indep. J. Rev.*, 92 F.4th 252, 257 (4th Cir. 2024).

The Supreme Court has long held that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969). "At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). Further, "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* In this way, "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940) (first citing John Milton, *Areopagitica* (1644); and then citing *Near v. Minnesota*, 283 U.S. 697, 713 (1931)).

Governor Youngkin argues that the unfettered-discretion doctrine does not apply to voting-rights challenges like Hawkins's because, in his view, voting doesn't implicate the First Amendment at all and, even if it did, any such challenges would be circumscribed by,

19

and dependent on, the Fourteenth Amendment. He cites two cases in which we held that the role of the First Amendment in determining who appeared on the ballot was no broader than that which the Fourteenth Amendment would provide. *See Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1359 (4th Cir. 1989) ("In voting rights cases, the protections of the First and Thirteenth Amendments 'do not in any event extend beyond those more directly, and perhaps only, provided by the [F]ourteenth and [F]ifteenth [A]mendments.'" (quoting *Washington v. Finlay*, 664 F.2d 913, 927 (4th Cir. 1981))); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 959 n.28 (4th Cir. 1992) (noting that we "ha[ve] held that in voting rights cases, no viable First Amendment claim exists in the absence of a Fourteenth Amendment claim" (first citing *Irby*, 889 F.2d at 1359; and then citing *Finlay*, 664 F.2d at 927)), *abrogated in part on other grounds by Rucho v. Common Cause*, 588 U.S. 684 (2019).

The Governor reads this precedent too broadly. *Irby* concerned whether racial animus was behind the decision to appoint, rather than to elect, a school board; and in *Martin*, voters challenged the statewide election method for selecting superior court judges. When voters challenge the constitutionality of whether a governmental official is elected or appointed or whether primaries are local or statewide, their Fourteenth Amendment rights are directly implicated and their collective Free Speech rights only peripherally so. But when voters contend that components of the electoral system directly burden their First Amendment rights, as Hawkins does, this Court applies First Amendment doctrines to decide the issue. *See, e.g., Fusaro v. Howard*, 19 F.4th 357, 369 (4th Cir. 2021) (applying a First Amendment standard of review to a challenge brought by a voter who claimed that

20

a Maryland election law restricting access to the State's voter roll infringed his free-speech rights).

Nevertheless, Hawkins's claim fails because, as both other federal courts of appeal to consider this question have concluded, the discretionary exercise of Virginia's clemency power does not constitute a licensing system.[13] *See Hand*, 888 F.3d at 1207 (concluding that Florida was likely to succeed on the merits of its arguments against a facial unfettered-discretion challenge to its system of placing the re-enfranchisement decision in the hands of an "Executive Clemency Board," which included the Governor and three others); *Lostutter v. Kentucky*, No. 22-5703, 2023 WL 4636868, at *3 (6th Cir. July 20, 2023) (rejecting facial unfettered-discretion challenge to Kentucky's system of placing the re-enfranchisement decision solely in the hands of the Governor).

The Sixth Circuit identified four ways in which a pardon is "fundamentally different from . . . an administrative license or permit." *Lostutter*, 2023 WL 4636868, at *3. First, "pardons are retrospective in the sense that they look backwards and excuse—indeed, nullify the consequences of—past misconduct," whereas a license "is usually prospective in that it looks forward and grants permission to engage in some future conduct." *Id.* at *4. Second, "a partial pardon is a one-time act of clemency, while a typical license or permitting scheme is ongoing—that is, the license or permit must be renewed periodically."

---

[13] In his filings before this Court, Hawkins refers to Virginia's "arbitrary re-enfranchisement" system. *E.g.*, Opening Br. at 15. We agree that a truly arbitrary system would be unconstitutional. *See Woodard*, 523 U.S. at 289 ("Judicial intervention might . . . be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency[.]"). But, based on the facts before us, the system Hawkins challenges is discretionary, not arbitrary.

21

*Id.* Third, "felon reenfranchisement . . . derives from the Governor's executive clemency power," but "a licensing scheme regulating First Amendment-related conduct is typically grounded in the State's authority to promote public safety and well-being." *Id.* Fourth and finally, "a pardon restores the felon to the status quo before the conviction" so that they "regain[] a right once held but lost due to illegal conduct," but "licenses regulating First Amendment activity by their nature do not restore any 'lost' rights[ but] only regulate how persons may engage in or exercise a right they already possess." *Id.*

We agree with the Sixth Circuit's reasoning. Pardons and licenses have characteristics that distinguish them. Perhaps most importantly, they derive from different sources of power within the Virginia Constitution.

Hawkins attempts to overcome the differences between licensing and re-enfranchisement systems by arguing that the Supreme Court has commanded courts to evaluate First Amendment challenges functionally, not formalistically. This is correct, but irrelevant.

In Virginia, an individual convicted of a felony is constitutionally stripped of the right to vote. Consistent with historical practice, only the Governor can exercise the executive grace to restore this right. Our Constitution does not contemplate a similar deprivation of rights absent a criminal conviction. The unique role of the executive in this process is enough to demonstrate that this *ancien* prerogative is not just functionally different but different in kind from the power to issue an administrative license. And that constitutionally grounded distinction, in turn, has implications for how felon reenfranchisement—as opposed to licensing—interacts with the First Amendment. Given

22

the historically limited role of the judiciary in restraining the use of the executive clemency power, and the longstanding role of discretion in that power, we will not import the unfettered-discretion doctrine from the licensing world into this wholly different context.

This distinction also resolves a hypothetical Hawkins poses. He hypothesizes a system in which the Governor has unbridled discretion to grant the right to vote to 16- and 17-year-olds. Those minors, he reasons, possess no fundamental right to vote, so they are situated similarly to the constitutionally disenfranchised felon. He posits that the Governor could not exercise unfettered discretion in granting some minors the right to vote but not others—and that this demonstrates that the unfettered-discretion doctrine applies to his case, too.

A system in which minors would be able to vote but for their age and could, in the hypothetical, seek gubernatorial permission to vote *despite* their age, might look very much like a licensing or permitting scheme. We suspect that in such a case, therefore, the unfettered-discretion doctrine *would* apply. But, even if so, that hypothetical system bears no relation to the pardon power. It tells us nothing about the very different context of a constitutionally disenfranchised felon seeking re-enfranchisement through a discretionary system rooted in the executive's clemency power.

To be sure, Hawkins touches upon an important underlying concern when he points out that "[a]pplicants [for voting restoration] can signal their viewpoints and party preferences to the [Governor], or the [Governor] can access or receive information on the same through readily available sources like political donation or voter registration history and social media accounts." J.A. 270. To be clear, Hawkins does not allege that Governor

23

Youngkin or any other Virginia official has done such a thing. But the implication is that a future Governor may do what has not been alleged here: namely, use verboten criteria as a basis for re-enfranchisement decisions. That concern may not be farfetched: it is much easier for a sophisticated actor to gather sufficient information on the average individual to make a predictive judgment about a person's future voting behavior today than it would have been in 1870 when the Virginia Constitution first vested the Governor with this discretion. Such malfeasance would also be hard to detect. To whatever extent it is normatively desirable to create a prophylactic rule to prevent such behavior, however, the foregoing discussion shows why the First Amendment unfettered-discretion doctrine does not provide a suitable vehicle to do so.

In short, we hold that Virginia's entirely discretionary system for voting-rights restoration, rooted in the executive clemency power, does not facially violate the First Amendment unfettered-discretion doctrine.

## IV.

Hawkins's challenge to Virginia's re-enfranchisement system is fit for review by this Court but ultimately fails. Thus, for the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*

24